**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 3 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STEPHEN MOORE,

      Petitioner - Appellant,

v.

RICHARD MARR and THE
ATTORNEY GENERAL FOR THE
STATE OF COLORADO,

      Respondents - Appellees.

No. 00-1015

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 95-S-2454)**

---

Howard A. Pincus, Assistant Federal Public Defender (Michael G. Katz, Federal
Public Defender, with him on the briefs), Denver, Colorado, for Petitioner-
Appellant.

Paul E. Koehler, Assistant Attorney General (Ken Salazar, Attorney General, with
him on the brief), Denver, Colorado, for Respondents-Appellees.

---

Before **EBEL** and **LUCERO**, Circuit Judges, and **VRATIL**,* District Judge.

---

**LUCERO**, Circuit Judge.

---

    * The Honorable Kathryn H. Vratil, United States District Judge for the
District of Kansas, sitting by designation.

Stephen Moore was convicted in 1988 by a Colorado jury of first-degree assault, a crime of violence for stabbing, and one count of felony menacing for wielding a gun. He was sentenced to twenty-six years in prison. After exhausting his state court remedies, he sought habeas corpus relief in federal district court. The district court denied his request for habeas relief and also denied his request for a certificate of probable cause. Our jurisdiction is premised on 28 U.S.C. § 1291 and 28 U.S.C. § 2253. Although we grant Moore's request for a certificate of appealability ("COA") on all issues,[1] we affirm the district court's denial of his request for habeas relief.[2]

## I

On July 4, 1987, Moore, accompanied by James Klevenz, went to the apartment of a friend and sometime employer, Kenneth Goudie, seeking $150 Goudie owed him. When Moore arrived, he found Goudie on his couch—Goudie had spent the entire night before drinking and playing cards. Moore came armed with a cane, a knife, and a gun, allegedly because he feared Goudie's temper.

---

[1] Because the Antiterrorism and Effective Death Penalty Act of 1996 applies to Moore's right to appeal, see infra Part II.A, we construe his request for a certificate of probable cause as a request for a COA. See, e.g., Tillman v. Cook, 215 F.3d 1116, 1120 (10th Cir. 2000).

[2] We have considered appellant's pro se filings in deciding this appeal. To the extent necessary, we have construed such filings as motions to file supplemental documents on appeal and have granted those motions.

Not surprisingly, the visit by the well-armed creditor to the intoxicated debtor soon took a violent turn. At trial, Moore admitted he began the scuffle, which later ended in Goudie's stabbing, by beating Goudie with the cane. Goudie managed to grab the cane from Moore and then beat Moore with the cane, breaking Moore's glasses and knocking Moore to his knees. While on his knees Moore stabbed Goudie in the chest, puncturing his lung and causing him to suffer cardiac arrest. After stabbing Goudie, Moore pointed a gun at him and demanded his money, pursuant to which Goudie gave him $200.

The sole factual dispute at trial was whether Moore stabbed Goudie in self-defense. Moore claimed that after he began beating Goudie with the cane, there was a break in the action. He alleged that Klevenz broke up the initial fight and then Goudie attacked him.

Moore raises three arguments in support of his appeal. First, he argues he was denied effective assistance of counsel at trial because his counsel failed to impeach Goudie with a prior inconsistent statement and failed to obtain testimony from two potential witnesses. Second, he alleges the state committed a Brady violation when it did not disclose that Goudie, the key witness for the prosecution, had applied for and received victim compensation payments. Finally, Moore asserts his Confrontation Clause rights were violated by the limits the state court placed on his ability to cross-examine Goudie.

## II

## A. Standard of Review

Appellant asserts that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to his appeal because his original habeas corpus petition was filed before the effective date of the Act; appellees do not appear to disagree with that assertion. In Slack v. McDaniel, 529 U.S. 473, 481–82 (2000), however, the Supreme Court clearly rejected appellant's position and held that post-AEDPA law governs the right to appeal in any case where the notice of appeal was filed after the effective date of AEDPA. See also English v. Cody, 241 F.3d 1279, 1281 (10th Cir. 2001); Tillman v. Cook, 215 F.3d 1116, 1120–21 (10th Cir. 2000).

Appellees' failure to object to appellant's argued-for standard of review is understandable. As the Court concluded in Slack, AEDPA codifies the pre-AEDPA certificate of probable cause standard announced in Barefoot v. Estelle, 463 U.S. 880 (1983), with the exception that AEDPA's requirement for the right to appeal is a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), while the pre-AEDPA requirement was a "substantial showing of the denial of a federal right." Slack, 529 U.S. at 483–84. In Tillman we reviewed the Court's ruling in Slack and determined that although it "may have some effect on non-constitutional claims" raised in petitions for habeas

- 4 -

corpus, it does not change the standard for reviewing constitutional claims. Tillman, 215 F.3d at 1120. The standard for reviewing a habeas petitioner's right to appeal announced in Barefoot is as follows:

> [P]etitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further.

463 U.S. at 883 n.4 (citations and internal quotations omitted). We will grant habeas relief only if petitioner shows the alleged state court error "'deprived him of fundamental rights guaranteed by the Constitution of the United States.'" Tillman, 215 F.3d at 1121 (quoting Brown v. Shanks, 185 F.3d 1122, 1124 (10th Cir. 1999)).

To clear up any future confusion in cases where a petition for habeas corpus was filed with the district court prior to AEDPA and the notice of appeal was filed with this Court after AEDPA, we note that Slack overrules our prior precedent holding that AEDPA did not apply in such situations. See, e.g., Rodgers v. Wyo. Att'y Gen., 205 F.3d 1201, 1202 n.1 (10th Cir. 2000); Fowler v. Ward, 200 F.3d 1302, 1307 (10th Cir. 2000).

Although AEDPA clearly governs Moore's right to appeal in this case, pre-AEDPA law governs our review of petitioner's claims. See English, 241 F.3d at 1281; Tillman, 215 F.3d at 1121. We review legal issues de novo and the federal

district court's findings of fact for clear error. Tillman, 215 F.3d at 1121. Under pre-AEDPA law, any findings of fact made by the state courts are entitled to a presumption of correctness. Id.; see also 28 U.S.C. § 2254(d) (1994).

## B. Effective Assistance of Counsel

Moore claims his trial counsel was ineffective because he failed to impeach Goudie with a prior inconsistent statement and because he failed to obtain the testimony of two potential witnesses for trial. Moore's ineffective assistance of counsel claim is a mixed question of law and fact that we review de novo. Sellers v. Ward, 135 F.3d 1333, 1344 (10th Cir. 1998).

The test for establishing constitutionally ineffective assistance of counsel is twofold. Petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that counsel's substandard performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 688 (1984). To meet the first prong, petitioner must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance." Id. at 690. This standard is "highly demanding." Kimmelman v. Morrison, 477 U.S. 365, 382 (1986). Strategic or tactical decisions on the part of counsel are presumed correct, Strickland, 466 U.S. at 689, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy," Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000)

(quotation and citations omitted) (alteration in Fox). To prevail on the second, prejudice prong , petitioner "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." Strickland , 466 U.S. at 694. This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell , 506 U.S. 364, 372 (1993).

### 1. Failure to Impeach

During the prosecution's direct examination, Goudie admitted he had been drinking all night before his encounter with Moore and had not gone to sleep until 10 a.m. on July 4. He also testified he had not been using any drugs, aside from alcohol, nor had anybody else at the party. He reiterated this during cross-examination, asserting further that he did not use drugs as a general matter. Although Moore's counsel had access to Goudie's medical records, counsel did not attempt to impeach Goudie by cross-examining him on his admission to hospital personnel the day of the stabbing that he had been drinking and had "snorted coke." [3] (II R.O.A., IV State R. Def.'s ex. 23 at 3.)

---

[3] Counsel did attempt to impeach Goudie's assertion that he had not done drugs with a photo of his living room from the day of the incident displaying what was arguably a roach clip and cocaine paraphernalia, but the court sustained the prosecution's objections to this line of questioning. Additionally, the court

(continued...)

- 7 -

Moore argues his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's failure to impeach Goudie, the prosecution's key witness. If counsel had cross-examined Goudie on the basis of his prior inconsistent statement in his medical record, Moore argues, counsel could have destroyed Goudie's credibility with the jury. Since the trial's outcome depended on the jury's assessment of Goudie's word against Moore's concerning the allegation that Moore acted in self-defense, the argument continues, counsel's failure to impeach Goudie, or even to attempt to do so, was ineffective as well as prejudicial.

In order to assess Moore's ineffective assistance of counsel claim, we briefly review the evidence presented at trial. It is uncontroverted that Moore came over to Goudie's house bearing three weapons: a gun, a knife, and a cane. It is further uncontested that Moore beat Goudie with the cane, stabbed him with the knife, and pointed the gun at him. [4] At trial Moore's credibility was called into doubt by the introduction of his two prior felony convictions, one of which occurred within a year of the trial and involved assault of a police officer.

---

[3](...continued)
allowed Moore to testify to his belief, based on his prior experiences with the victim, that Goudie was on cocaine at the time of the incident.

[4] Moore admitted at trial that he came to Goudie's bearing a gun, but in his earlier statement to police he flatly and repeatedly denied having a gun at the time of the incident.

Importantly, Goudie's story that he was attacked by Moore was strongly supported by the testimony of his neighbors, one of whom did not even know Goudie prior to the incident. Conversely, Moore's story was not supported by any of the witnesses. For instance, Moore testified he was forced out the door of Goudie's apartment as Goudie beat him, he was then pushed up against the railing of the building, and finally he had no choice but to stab Goudie. Goudie's neighbor and acquaintance, Michael Hartford, testified that he saw Moore advancing on Goudie while Goudie screamed "Don't come near me anymore. Don't come near me anymore." (II R.O.A., XII State R. at 152.) He also testified that Goudie was trying to keep Moore away as Moore tried to stab him with the knife. Another neighbor, Richard DeBarris, who did not know Goudie until the incident, testified that he saw Moore stab Goudie as the two backed out of the apartment, and that Goudie was backed up by Moore's approaches, not vice versa.

Although counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, we need not examine that issue because we hold Moore has failed to demonstrate prejudice from his counsel's omissions and thus has failed to establish he was denied effective assistance of counsel, id. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course

should be followed."). Our review of the trial transcript shows that overwhelming evidence against Moore was presented at trial, even absent Goudie's testimony. In addition, Goudie testified that he had been drinking heavily not long before the fight ensued. [5] Accordingly, even if Goudie had been impeached we cannot conclude that the outcome would have been different. As Moore's trial counsel stated:

> This was never a great case from the beginning unfortunately. . . . You look at it, break it down to the bottom line facts. You've got a man [Moore] who is going to testify with two prior felony convictions who's going over armed with a cane, a gun and a knife, admits to the police and admits on the stand that he began the argument, began the fight, stabbed the victim, and then claims self defense. With all due respect to Mr. Moore, that's a hard story to sell to a jury.

(II R.O.A., VII State R. at 86–87.)

2. Failure to Obtain Testimony from Marta Musich

Moore also asserts that his counsel was ineffective because he failed to obtain the testimony of Marta Musich. She allegedly would have testified to

---

[5] We acknowledge that the effects of cocaine may be different than the effects of alcohol, as is the social stigma associated with the two drugs. Thus, evidence that Goudie used cocaine at or near the time of the fight and then lied about it on the stand could possibly have had an impact on the jury's perceptions of his credibility, volatility, and ability to remember clearly the events of the fight. We note, however, that the record does not contain information regarding the different effects of the two drugs and that, even if it did, Moore still could not meet the prejudice prong of Strickland due to the other, overwhelming evidence introduced against him at trial.

- 10 -

Goudie's reputation for violence, thus justifying Moore's need to go to Goudie's house armed and supporting his claim that he acted in self-defense.

We conclude that counsel's failure to obtain Musich's testimony, even if completely unreasonable, [6] did not prejudice Moore's defense. Although Moore was the only person to testify directly as to Goudie's recent violent history, the prosecution did not try to contradict Moore's assertion. [7] Whether or not Goudie was a violent man with a history of attacking others, the facts at trial clearly established that Moore hit Goudie first and eventually stabbed him. Additional

---

[6] Our review of the record leaves us less certain than the district court that "it does not appear that defense counsel could easily have procured [Musich's] presence at trial." (I R.O.A. Doc. 50 at 3.) Nevertheless, we need not determine the likelihood of Musich's presence in order to resolve Moore's claim.

[7] Sergeant David Maclaughlin, a police officer who investigated the stabbing, had an opportunity to refute Goudie's violent record but did not. (See II R.O.A., XII State R. at 177 ("Q: [Moore] also indicated to you that he knew on occasion how violent Mr. Goudie could be, is that correct, regarding an incident where Mr. Goudie had crushed somebody's cheekbone? . . . [Maclaughlin]: Yes. I think it was a Mr. Steele . . . He asked me if I could—his words were, 'Have you checked Goudie's record?' and I said, 'Yes.'").)
Moore points us to the prosecutor's statements in closing argument that Moore was the only one to testify to Goudie's violent nature. (See II R.O.A., XIII State R. at 21 ("Stephen Moore tells you he knew that Kenneth Goudie was violent. Stephen Moore is the only person that told you that, he is the only person that you heard that from. There were other witnesses up there, they could have been asked that question, too."); id. at 23 ("[Moore is] the only one that told you anything about what a bad guy Ken Goudie is. That's the only person you have got it from.).) Although the prosecutor focuses on the fact that Moore's testimony stood alone, the fact remains that the prosecution did not introduce evidence to refute Goudie's alleged reputation for violence and that Moore's statements were thus uncontroverted.

evidence of Goudie's violent character would have done nothing to refute the uncontroverted fact that Moore used the three weapons he carried with him against Goudie. Nor would such evidence mitigate Moore's admission that he carried the knife with him as a general matter. [8] Finally, evidence of Goudie's violent temper could do nothing to mitigate the evidence of Moore's own history of violence, in particular his admission at trial that when he loses his temper he hurts people. [9]

3. Failure to Obtain Testimony from James Klevenz

We also affirm the district court's denial of Moore's ineffective assistance of counsel claim premised on the failure of his counsel to obtain the testimony of James Klevenz. Klevenz allegedly would have testified that he broke up the first fight between Goudie and Moore by inserting himself in the middle and that the

---

[8] In response to the question "Do you ordinarily take a club, knife and gun with you when you go to people's houses?" Moore stated "Sometimes I carry a gun when I think I have been threatened. The stick is a walking stick, it was very light, and the knife, I carried it." (II R.O.A., XII State R. at 198.)

[9] The following discussion occurred during the prosecution's cross-examination of Moore:

Q: You have a real bad temper, right?
A: No, not really.
Q: When you lose it, it's really bad, isn't it?
A: Yes, but I don't lose it very often.
Q: But when you lose it, you hurt people, too, right?
A: Yes.

(Id. 202.)

- 12 -

stabbing resulted from a second fight, initiated by Goudie, and was an act of self-defense.

In state post-conviction proceedings, Moore testified he told his trial counsel that Klevenz was likely either in New Jersey or Pennsylvania. Klevenz, however, testified he never left Colorado. Moore's trial counsel enlisted the aid of an investigator to attempt to find Klevenz, and the investigator made continued efforts to try to locate him. Klevenz, however, testified he did not want to be found and actively avoided service. [10] Not only did he avoid service of a subpoena

---

[10] Klevenz's own testimony at Moore's state post-conviction proceedings shows he had no intention of showing up at any trial until he had cleared up his own legal problems. (See II R.O.A., XVI State R. at 112 ("I was wanted for a lot of things at the time. That's why I didn't show up at the original trial."); id. at 113 ("My only reason I didn't testify was I was wanted for various crimes and I was scared and I wasn't coming to court for nobody. . . . They tried to serve [a subpoena] on me. I looked out the window and didn't answer.").) Particularly significant was the following testimony:

> [Klevenz]: Like I said, I was wanted for numerous violations. I had left the state earlier, couple years earlier. I was on parole—not parole, probation. . . . I was wanted for numerous things and I was worried about getting caught. . . . I even–the police, I didn't even give them my right name. I gave them Raymond Gotnet. . . .
> [Question]: Why didn't you come forward later?
> [Klevenz]: Since then, I've . . . taken care of everything that I had against me.
> [Question]: Would you appear at another trial?
> [Klevenz]: I certainly would.

Id. at 116. Unfortunately for Moore, the necessary predicate of Klevenz's clearing up his record did not occur until after Moore's trial.

- 13 -

by Moore, but he avoided service by the prosecution, who also would have liked him to testify.

The state court held an evidentiary hearing on the effectiveness of Moore's counsel, and we owe that court's findings of fact a presumption of correctness. 28 U.S.C. § 2254(d) (1994). The court found that Moore, against the advice of counsel, refused to ask for a continuance and to waive his right to speedy trial. Counsel advised Moore that a continuance would allow him to make additional efforts to locate Musich and Klevenz and would also give him further time to prepare. The trial court found counsel's testimony at the hearing credible concerning Moore's own strategic error, namely his estimate that the prosecution would not be able to prepare for trial within the speedy trial period. Accordingly, the court concluded that Moore's failure "to follow counsel's advice in obtaining a continuance of the trial was the sole contributing factor in defense counsel's inability to locate and present witnesses." Colorado v. Moore, No. 87 CR 903, slip op. at 11 (Adams County, Colo. Dist. Ct. Dec. 11, 1991).

In this appeal, Moore argues that because the state court did not make a factual finding concerning whether Klevenz could have been located before trial, the federal court should have held an evidentiary hearing on that issue. He attempts to argue that the state public defender's lack of knowledge concerning

what the investigator did to try to locate Klevenz precludes a finding that reasonable efforts were made.

We conclude that the hypothetical ability to locate Klevenz before trial is not conclusive with regard to Moore's counsel's effectiveness. To be entitled to an evidentiary hearing, Moore would have to "make allegations which, if proved, would entitle him to relief." Stouffer v. Reynolds, 168 F.3d 1155, 1168 (10th Cir. 1999) (quotation omitted). Even if he proved Klevenz could have been found, he would not be entitled to relief because, as the district court concluded, "defense counsel's efforts were reasonable." (I R.O.A. Doc. 50 at 5.) Klevenz actively avoided service, Moore gave his counsel incorrect information regarding Klevenz's whereabouts, Moore refused to waive his speedy trial right in order to give counsel additional time to locate Klevenz despite counsel's advice, and counsel employed a professional investigator to find Klevenz. Evaluating "[t]he reasonableness of counsel's performance . . . from counsel's perspective at the time of the alleged error and in light of all the circumstances," Kimmelman, 477 U.S. at 381, we simply can not conclude counsel's performance fell "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690. Accordingly, we need not reach the prejudice prong of the ineffective assistance of counsel test, and we affirm the district court's denial of Moore's Sixth Amendment claims.

## C. __Brady__ Violation

Moore's next claim is a matter of first impression in this Court. He asserts the prosecution committed a __Brady__ violation by failing to disclose that Goudie had applied for and received victim compensation payments.[11]

Under __Brady v. Maryland__, 373 U.S. 83, 87 (1963), the prosecution violates a defendant's due process rights when it fails to disclose evidence favorable to the defendant that was material either to guilt or punishment. The __Brady__ rule is applicable where the suppressed evidence was impeachment evidence. __United States v. Bagley__, 473 U.S. 667, 676 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. __Id.__ at 682. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of the case. __Id.__ "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" __Moore v. Gibson__, 195 F.3d 1152, 1165 (10th Cir. 1999) (quoting

---

[11] The receipt of payments at issue is limited to Goudie's receipt of emergency pre-trial payments. The state court explicitly found that "any payments made to the victim after trial are not discoverable." __Colorado v. Moore__, No. 87 CR 903, slip op. at 8. As Moore points out, however, the district court did not make any findings with regard to the discoverability of the emergency payments received before the conclusion of the trial or with regard to the mere fact that Goudie had applied for such payments.

<u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)). Whether the allegedly suppressed evidence was material is a mixed question of law and fact that we review de novo. <u>Id.</u>

Prior to trial, Goudie applied for just under $10,000 in victim compensation payments under Colorado law. <u>See</u> Colorado Crime Victim Compensation Act, Colo. Rev. Stat. §§ 24-4.1-100.1 to -304. He also applied for, and received, a $500 emergency payment. The program administering such payments was run with the help of the Colorado district attorney's office.

Before this Court, Moore argues that the potential to receive victim compensation payments gave Goudie a "powerful incentive to paint himself as the 'victim'" (Appellant's Br. at 42); i.e., Goudie had a $10,000 interest in testifying that Moore attacked him and that Moore did not act in self-defense. <u>See</u> Colo. Rev. Stat § 24-4.1-108(1) (entitling crime victims to compensation). According to Moore, introduction of Goudie's monetary interest in testifying would have affected his credibility to the jury.

Goudie's application for victim compensation payments and application for and receipt of emergency victim compensation payments may well have been "favorable" within the meaning of <u>Brady</u>.[12] Because Goudie's receipt of such

---

[12] We note that the determination of whether evidence is material under <u>Brady</u> and thus should have been produced is a different question than whether

(continued...)

- 17 -

payments depended on a finding by the Crime Victim Compensation Board that he did not substantially provoke Moore in the course of the altercation, introduction at trial of the fact of the application would have demonstrated that Goudie had a financial interest in painting himself as the "victim." See id. § 24-4.1-108(1)(e) (disallowing compensation if the victim's injuries are "substantially attributable to his wrongful act or substantial provocation of his assailant"). Additionally, introduction of Goudie's application for emergency payments could have supported an assertion that Goudie was in dire financial straits and thus had a greater incentive to vilify Moore. While appellees correctly note a conviction is not necessary for victim compensation payments to be approved by the Board, see id. § 24-4.1-106(3), it belies common sense to think the Board would have ignored a "not guilty by reason of self-defense" verdict in making its decision regarding Goudie's status as a "victim." Furthermore, Goudie's payment was guaranteed in the event Moore was convicted. See id. §§ 24-4.1-108(1), -106(3).

Because we conclude Moore has not demonstrated that the victim witness information was material, we need not determine whether the information was

---

[12](...continued)
the same evidence is admissible at trial. See Colo. Rev. Stat. § 24-4.1-107.5(2) (deeming materials associated with an application for victim compensation confidential and providing that such materials "shall not be discoverable unless the court conducts an in camera review . . . and determines that the materials sought are necessary for the resolution of an issue then pending before the court").

favorable. Accordingly, we hold there was no Brady violation. As we discussed in depth while analyzing Moore's ineffective assistance of counsel claim based on the failure to impeach Goudie with evidence that he had been doing drugs the night before the incident, we do not conclude there was a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 676 (internal quotations omitted). There was overwhelming evidence of guilt including: the testimony of multiple witnesses that Moore was the aggressor, the fact that Moore went to Goudie's apartment heavily armed and employed each weapon before leaving, and Moore's admission that he started the fight. [13]

---

[13] Additionally, although we are mindful of the post hoc nature of Moore's counsel's testimony that he would not have used the evidence to impeach Goudie even if he had it, we, like the district court, find it enlightening with regard to the ultimate issue of whether disclosure would have had a reasonable probability of altering the result at trial. Moore v. Marr, No. 95-S-2454, order at 7 (D. Colo. Nov. 30, 1999) ("While counsel's statement, made several years after trial, is not dispositive about whether the evidence actually would have been used, it does provide some instruction on this issue."). At the post-conviction hearings in state court, Moore's counsel testified as follows regarding the victim compensation information:

> [Moore's Trial Counsel:] . . . I stipulated in this case to serious bodily injury as a tactical decision . . . because I don't want the jury to have some doctor up there testifying in detail about a punctured lung and cardiac arrest and what impact it had on the victim, how it's going to affect him, the scars, things like that. Juries hear about that. They don't like that. . . .
> The problem with the Victim Compensation Fund . . . you open

(continued...)

## D. Confrontation Clause

Moore's final claim is that his Sixth Amendment Confrontation Clause rights were violated by the limits placed on his counsel's ability to cross-examine Goudie.  We review claims under the Confrontation Clause de novo.  Fowler, 200 F.3d at 1307.  Habeas relief is warranted only if there is an error that was not

---

[13](...continued)
up a door to allow the prosecution to then question as to what the basis of the payments are, allowing them to bring in a lot of evidence that I as a defense lawyer don't want in front of juries in the first place, let alone rehash with incredible details as to all different drugs he's given and things like that.  It can backfire and in the end it can outweigh it.
　　In this particular case, although it might have been useful and it might have had an impact, the victim was stabbed and he did go to the hospital and he did suffer a cardiac arrest and there were medical problems. . . . The problem is that this opens up the door. . . .
Q  In this case in your opinion would it have been a useful impeachment tool?
A  That's hard to say.  The jurors might have found it interesting.  I think it wouldn't have been as useful as Mr. Moore would like it to be because it would have opened up doors I wouldn't have wanted to open.  If I recall correctly, when I became aware of the Victim Compensation Fund thing, Mr. Moore and I had addressed it and when I filed a motion for new trial, I chose not to address the issue on a motion for new trial because I believe I decided it wasn't relevant, that it wouldn't have made an impact in the case.  That was my call.  I still maintain that it probably wouldn't have made a difference in the case . . . .

(II R.O.A., VII State R. at 73–74.)  Additionally, Moore's counsel testified that, in his seven years of experience as a public defender, neither he nor any public defender he knew had ever sought the discovery of, or tried to use, victim compensation payment information to impeach a victim-witness's testimony.

harmless. Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence, see Estelle v. McGuire, 502 U.S. 62, 67–68 (1991), and federal courts may not interfere with state evidentiary rulings unless the rulings in question rendered "the trial so fundamentally unfair as to constitute a denial of federal constitutional rights," Tucker v. Makowski, 883 F.2d 877, 881 (10th Cir. 1989) (quotations and citations omitted).

At trial, the court sustained the prosecution's motion to disallow cross-examination of Goudie concerning a picture allegedly displaying drugs and drug paraphernalia. The prosecution successfully argued that while such evidence may have been relevant to Goudie's ability to perceive the events in question, it was not relevant for any other purposes, and thus its value was more prejudicial than probative. Moreover, the court found that the important issue was whether Goudie was intoxicated and not the type of intoxicant used. (II R.O.A., XII State R. at 137 ("The only issue is whether or not he was intoxicated. He has already indicated that he may have been. As to what type of intoxication, I don't think that is relevant and the court will sustain the objection.").)

The Supreme Court has stated that the Confrontation Clause does not prevent trial judges from imposing limits on cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). In Van Arsdall, the Court noted that "trial

judges retain  wide latitude  insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . prejudice, . . . or interrogation that is repetitive or only marginally relevant."  Id. (emphasis added).  In examining the extent of any alleged harm caused by the court's limitations we consider factors including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  Id. at 684.

As an initial matter, we have already concluded that impeachment of Goudie on his drug usage would not have had a reasonable probability of changing the outcome of the trial; accordingly, even if the trial court erred, we hold such error was harmless.  In weighing the potential harm of the alleged error, we note that the trial court did not limit altogether Moore's ability to cross-examine Goudie on drug use.  In fact, the trial court allowed verbal cross-examination on Goudie's alleged drug use and even allowed Moore to testify as to whether Moore believed Goudie was under the influence of drugs.  The trial court exercised its "wide latitude" of discretion to prevent the admission of a line of questioning it reasonably assessed was more prejudicial than probative.  Although

the Confrontation Clause guarantees an opportunity for cross-examination, it does "not [guarantee] cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Van Arsdall, 475 U.S. at 679 (quotations omitted).

### III

Because the issues raised by Moore's petition are "debatable among jurists of reason," Barefoot, 463 U.S. at 883, we **GRANT** Moore's request for a COA; however, because we do not conclude Moore was deprived of "fundamental rights guaranteed by the Constitution of the United States," Tillman, 215 F.3d at 1121 (quotation omitted), we **AFFIRM** the district court's denial of habeas relief.