**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RAWLAND B. FLEEKS,

      Petitioner - Appellant,

v.

DAYTON J. POPPELL, Warden,

      Respondent - Appellee.

No. 01-6405
(D.C. No. 00-CV-1887-C)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL** and **BRISCOE**, Circuit Judges, and **SHADUR**,[**] District Judge.

---

      Petitioner Rawland B. Fleeks was convicted in Oklahoma state court on one count of burglary and one count of robbery. After seeking state post-conviction relief, Petitioner sought and was denied habeas relief in the Western District of Oklahoma. This court granted a certificate of appealability ("COA") on Petitioner's ineffective assistance claim with respect to trial counsel's failure to

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]Honorable Milton I. Shadur, Senior United States District Judge, Northern District of Illinois, sitting by designation.

cross-examine Albert Lee Brown, Jr., regarding an alleged plea deal that Brown received in exchange for his testimony against Petitioner. We conclude that Petitioner's claim is procedurally barred and that, because the claim also fails on the merits, the procedural bar cannot be excused for cause and prejudice. Therefore, we AFFIRM the district court's denial of relief.

I.  **BACKGROUND**

A.  **Factual Background and Trial Court Proceedings**

In April 1995, Petitioner was charged by information in Garfield County District Court with one count of burglary in the first degree and one count of robbery by force after former conviction of two or more felonies. A preliminary hearing was held in September 1996, and Petitioner's trial was held on May 12–13, 1997. The jury found Petitioner guilty on both counts. Based on the jury's recommendation, the trial court sentenced Petitioner to fifty-five years' imprisonment on the robbery charge and forty-five years' imprisonment on the burglary charge, with the sentences to be served consecutively.

The evidence at trial was as follows. Luella Helms testified that on March 24, 1995, she had been visiting her elderly mother, Myrtle White, at Ms. White's home in Enid, Oklahoma. Around 8:00 pm, Ms. Helms stepped into the dining room and saw a man dressed in tan coveralls and an orange ski mask standing in

front of the living room window. When she asked the intruder what he wanted, he "rushed" her, grabbed her, and started hitting her in the forehead with his fists. The intruder eventually threw her to the floor and demanded money. In her purse, Ms. Helms had about $25, which the intruder took. When he noticed her rings and started yanking on them, Ms. Helms took the rings off and gave them to him. Ms. Helms identified the two rings at trial, and they were entered into evidence. The first ring comprised of her wedding band, engagement ring, and a ring guard. The wedding band had four diamonds, the engagement ring had one diamond, and the ring guard had six small diamonds. The second ring was a gold nugget with seven small diamonds. Ms. Helms was unable to testify to the identity of her assailant.

Only the testimony of two witnesses—Cheavel Cortez Lloyd and Albert Lee Brown, Jr.—linked Petitioner to the stolen rings. [1] Lloyd is Petitioner's eighteen-year-old stepson. At the time of the robbery, Petitioner was married to Lloyd's mother and lived in the same house with her and Lloyd. Lloyd testified on direct examination that, on the evening of the robbery, he was in the kitchen of his home

---

[1]Detective Bob Pritchett testified regarding his investigation of the robbery. None of his testimony, however, explained how Petitioner became a target of the investigation into the stolen rings.

Thomas J. Gibson, a forensic chemist for the Oklahoma Bureau of Investigation, was called by the defense. Gibson's testimony established that none of the DNA from blood samples at the crime scene matched Petitioner's DNA.

when Petitioner came in "real loud and sweaty," sat down, and stated, "'I got some rings.'" At trial, Lloyd identified the rings taken from Ms. Helms as those which had been in Petitioner's possession. Lloyd testified that, later that same night, he overheard one side of a telephone conversation between Petitioner and an unknown person, during which Petitioner stated that he had just broken into "an old lady's house" and had gotten some rings.

Lloyd testified that Petitioner had fresh cuts on his knuckles and that he was wearing brown coveralls and an orange ski mask and carrying a stick when he came into the house. Later in his testimony, however, when confronted by the prosecutor with a prior police statement, Lloyd conceded that the coveralls Petitioner was allegedly wearing that night might have been blue. Lloyd also testified that he had seen Petitioner with two $100 bills sometime around the date of the crime. Finally, Lloyd confirmed that no one from the prosecutor's office or from the Enid Police Department had promised him anything in exchange for his testimony or threatened him if he did not testify.

On cross-examination, Petitioner's trial counsel questioned Lloyd extensively about the inconsistencies between his testimony at trial and a prior statement he had made to the police. The statement was taken during an interview with Enid Police Detectives Don Brown and Bob Pritchett

approximately one month after the robbery. At the time he gave the statement, Lloyd was sixteen years old and in police custody on a separate burglary charge.

In the statement, Lloyd claimed that one evening the month before, Petitioner rang the door bell. When Lloyd answered the door, Petitioner entered the house breathing hard and fast. According to Lloyd's statement, Petitioner was wearing black pants, black shoes and a black coat. In his testimony at the preliminary hearing and trial, however, Lloyd testified that Petitioner wore tan coveralls, an orange ski mask and carried a stick.

During the cross-examination at trial, Lloyd's testimony denying that any favors or deals were extended to him by the police or the prosecution never changed. He did admit, however, that the criminal charge for which he was in custody when interviewed by the detectives was eventually dropped.

The other witness against Petitioner was Albert Lee Brown, Jr. Brown's testimony forms the basis of the claim presented in this appeal. At trial, Brown testified that in March and April of 1995, Petitioner approached him regarding some ladies' rings. Brown identified the rings at trial and testified that he had sold the nugget ring to Jerry Mitchell in April for $100 or $150 and had given all the money to Petitioner. He testified that he had sold the other ring to Laron Norwood in March for $200 or $250 and used the money to buy cocaine for

himself and Petitioner. Brown testified that he did not know where Petitioner had obtained the rings and that he had seen Petitioner wearing brown coveralls before.

Brown also testified regarding how the police acquired the rings from him. On April 12, 1995, Brown was approached by Detectives Don Brown and Bob Pritchett of the Enid Police Department with regard to the rings. The Enid police knew that Brown had had the rings in his possession and wanted him to get them back. Brown stated that he felt some pressure to get the rings back because he had taken possession of the rings without knowing where they had come from. He was able to get Jerry Mitchell and Laron Norwood to return the rings to the police.

Finally, Brown testified that he had nine previous convictions and that at the time of his testimony he was serving a 15-year sentence for unlawful delivery of narcotics.

On cross-examination, Petitioner's counsel concentrated on the inconsistencies between Brown's testimony at the preliminary hearing and his testimony at trial. Defense counsel questioned Brown regarding his testimony at the preliminary hearing that he had seen Petitioner in either brown or blue coveralls, whereas on direct examination he testified they were brown. She also further questioned Brown regarding whether he felt pressured into giving the police information about the rings to avoid prosecution for their theft. On direct

examination, Brown testified that the police were not pressuring him to get the rings back. At the Preliminary Hearing, however, Brown had stated "if I didn't get [the rings] back [the police] were wanting to implicate me in that crime." Defense counsel further elicited that, at the time of the April 12, 1995, interview with the Enid police, Brown was under house arrest, the terms of which he had violated on several occasions.

The gravamen of the claim on which we have granted a COA is that Petitioner's trial counsel was ineffective for failing to cross-examine Brown on the possibility that he had in fact cut a deal with the Enid police to testify against Petitioner in exchange for a reduced sentence on a grand larceny charge pending against him when he was interviewed about the rings. The evidentiary bases for this claim are 1) the April 12, 1995, statement that Brown gave to the police detectives and further notes made by the detectives regarding communication with Brown on April 13, 1995; 2) a form that Brown filled out in October 1995 in conjunction with the guilty plea that he entered on the grand larceny charge; and 3) Brown's testimony at the preliminary hearing in September 1996. We will describe these seriatim.

The first evidentiary basis is the April 12, 1995, statement Brown gave to police detectives Don Brown and Bob Pritchett regarding his knowledge of the stolen rings. Brown told the officers that he suspected Petitioner had been

committing burglaries and that, approximately three weeks before the interview, Petitioner had come to him with the nugget ring and asked him to sell it. About a week later, he saw Petitioner with the wedding set and discussed the fact that Petitioner was trying to get rid of it. Brown did not admit in the statement that he had sold the rings for Petitioner; however, he agreed to help the detectives locate the rings.

The conversation then continued:

DB [Detective Brown]: Okay, we uh, we understand that you're on probation right now.
AB [Albert Brown]: Right.
DB: And how much longer do you have on probation?
AB: Uh, well I'm on this house arrest, I got approximately you know three and a half years uh maybe three years and I have a five years suspended sentence.
DB: Okay now have we promised you anything for talking to us.
AB: No you haven't.
DB: Okay. Have you ask us for anything?
AB: Yeah.
**DB: Okay. Do you have pending charges at this time?**
**AB: Yes I do.**
**DB: Okay and what are those charges?**
**AB: Grand larceny, ALC.**
**DB: Okay uh, what is it that you've ask us to do?**
**AB: Well I've ask you know if you could put a word in or any kind of assistance I could get on this matter.**
**DB: Okay. And what did, and what was our response to you?**
**AB: Uh, that you know that you couldn't promise me anything. You would, you know, do some talking and see what you could do.**
**DB: Okay. So we haven't promised you anything?**
**AB: No.**
DB: Nor have we intimidated or threatened you to make these statements.
AB: No you haven't.

DB:    Okay. And you've came in on your own free will and freely talked to
          us . . .
AB:    Yes.
DB:    about this?
AB:    Yes I did.
DB:    And that your [sic] going to cooperate in assisting us in try to locate
          this jewelry uh, freely?
AB:    Yes.

(emphasis added).

Detective Bob Pritchett's notes from the next day, April 13, 1995, reflected

that Albert Brown had located the wedding ring set and could buy it back for

$200. Detective Pritchett arranged a meeting with Albert Brown and contacted

Detective Brown to come as well. Albert Brown never showed up, but the

detectives saw him on the street shortly thereafter. The detectives said they

would give him the money to purchase the rings but that he had to wear a wire.

Pritchett's notes then state:

> [Brown] told us that he didn't think that he wanted to wear the wire as it
> hadn't been mentioned to him before. I told him that there was no way I
> was going to give him the money without his being wired. I told him that
> for all I knew he had the ring in his pocket and he denied that. I told him
> with out [sic] the wire   there was no deal  . About that time Emerson Clinton
> Dixon III came riding around the corner to check on [Brown]. Dixon
> knows me so I told [Brown]   there would be no deal at this time   .

(emphasis added).

At trial, both the prosecution and defense counsel discussed Brown's April

12, 1995, statement with him. Both sides questioned Brown about whether he felt

he was pressured into obtaining the rings in order to avoid prosecution for their

theft. Defense counsel also elicited that Brown was under house arrest at the time of the interview and had violated the terms of that house arrest. But defense counsel did not bring up the fact that Brown had new charges of grand larceny pending against him at the time of the interview, that Brown had asked the detectives for their assistance with those charges, or that Detective Bob Pritchett's notes from April 13, 1995 indicated that the police had struck some type of "deal" with Brown.

The second basis for Petitioner's claim is that, in October 1995, in conjunction with his guilty plea to the grand larceny charge, Brown filled out a form entitled "Plea of Guilty: Summary of Facts." In response to the question, "Before the Court considers the plea and sentence recommendation, do you have any questions or wish to say anything further?," Brown circled "No," but then wrote, "I didn't get the deal promised by the Enid police department." He did not specify the details of the "deal" as he understood it; however, Brown did state in response to another question that he understood he was to receive a one-year sentence for grand larceny committed after two or more felony convictions. Offender information obtained from the Oklahoma Department of Corrections confirms that Brown did in fact receive this sentence.

At trial, defense counsel did not adduce evidence related either to Brown's one-year sentence on the grand larceny charge (despite his numerous prior felony

convictions) or to his complaint that he did not get the deal promised to him by the Enid police.

The third basis for the ineffective assistance of trial counsel claim is Brown's testimony at the September 1996 preliminary hearing. Brown admitted at the preliminary hearing that he had sold the two rings for Petitioner. Regarding the April 12, 1995, interview with the police detectives, Brown testified that the police approached him and asked if he could get the rings back. Brown did not know if he could, but stated that "[he] was kind of under the situation to where, you know, [he] had to get them back." The prosecutor asked, "When you say you were under the situation, what do you mean by that?" Brown answered, "Well, it was like they were—if I didn't get them back they were wanting to implicate me in that crime." Brown denied, however, that he was testifying at the preliminary hearing "to avoid prosecution in any way" or "to avoid implications in a particular crime."

Brown was then cross-examined by defense counsel; however, this was not the same counsel that represented Petitioner at trial. Counsel questioned Brown about the fact that he had been on an early release program in April 1995 and that he had violated the conditions of his program and was returned to the Enid correctional facility in May 1995. She also addressed whether Brown felt as

though he had to comply with the Enid police to avoid prosecution for the theft of the rings:

> Q:   Now you indicated when you were talking to the police of [sic] April 12th, or around that time of 1995, that you felt somewhat caught between a rock and a hard spot. If you didn't help them get back the rings, they may try to implicate you in this crime.
>
> A:   Right.
>
> Q:   And that was your feeling?
>
> A:   Yes.
>
> Q:   Okay. And is that still your feeling today that that is kind of what they meant at that time?
>
> A:   **Not necessarily. I had another charge pending also. And, you know, it was like—I had nothing to do with the crime but I feel like it was just a bluff on they behalf to scare me into helping them. So, you know, I felt like why not. You know, I didn't have anything to lose.**
>
> Q:   **You indicated you had another charge pending?**
>
> A:   **Yes.**
>
> Q:   **What was that?**
>
> A:   **That was for Grand Larceny From a Retailer. I was the manager at Goldie's Patio Grill and some money came up missing and I was implicated in that and charged with that.**
>
> Q:   **Okay. And what sentence did you receive for that?**
>
> A:   **A one year sentence.**
>
> Q:   **Time to do or suspended?**
>
> A:   **Time to do.**
>
> Q:   **Are those the only two felony convictions you have; Unlawful Delivery of Narcotic and the Grand Larceny?**
>
> A:   **That is what I'm serving time for.**
>
> Q:   **Are those the only two you have?**
>
> A:   **No. I have previews [sic] incarceration history.**
>
> Q:   **Okay. How many felony convictions do you have?**
>
> A:   **Maybe seven or eight.**

(emphasis added).

At trial, defense counsel questioned Brown regarding his fear of being prosecuted for the theft of the rings, but she did not address the fact that he had a grand larceny charge pending against him at the time of the April 12, 1995, interview, nor that he received only a one-year sentence on that charge, despite his "seven or eight" prior felony convictions, as revealed in this preliminary hearing testimony.

## B.     Direct Appeal and State Post-Conviction Proceedings

Petitioner obtained new counsel and appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals ("OCCA").  He did not raise his ineffective assistance of trial counsel claim, as required by Okla. Stat. Ann. tit. 22, § 1086.  After a remand for a competency hearing, the OCCA affirmed the conviction and sentence.

In November 1999, Petitioner filed an application for state post-conviction relief.  This time he asserted his ineffective assistance of trial counsel claims and argued that the ineffective assistance of his appellate counsel was the reason the claims had not been raised on direct appeal.  In his motion for relief, he included the April 12-13, 1995, interview notes with Albert Brown, but did not include the October 1995 plea summary in which Brown alleged he did not get the deal the Enid police had promised him.

- 13 -

The trial court denied Petitioner's application for post-conviction relief, and the OCCA affirmed, holding that Petitioner had waived his ineffective assistance of trial counsel claims by failing to raise them on direct appeal and that Petitioner's ineffective assistance of appellate counsel claims were without merit.

### C.    Section 2254 Proceedings

In November 2000, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the Western District of Oklahoma. He asserted seven claims for relief, including ineffective assistance of trial and appellate counsel. The district court permitted him to supplement the record with Albert Brown's October 1995 "Plea of Guilty: Summary of Facts" form.

The magistrate judge recommended that all of Petitioner's habeas claims be denied. She found that Petitioner's ineffective assistance of trial counsel claims were procedurally barred based on his failure to raise them on direct appeal and that his ineffective appellate counsel did not constitute cause to excuse the procedural bar because his underlying trial counsel claims were without merit.

The district court adopted the magistrate's recommendation in its entirety and denied Petitioner's application for a COA.

Petitioner applied to this Court for a COA, asserting eleven claims for relief. [2] We appointed counsel and granted COA only on the issue of whether Petitioner's trial counsel provided ineffective assistance in failing to cross-examine Albert Lee Brown, Jr. at trial regarding: (1) the fact that he had a grand larceny charge pending against him in Garfield County District Court at the time he agreed to cooperate with the police in the investigation of Petitioner; and (2) the fact that Brown subsequently entered a plea of guilty to the charge of grand larceny in that case and received only a one-year sentence in exchange for the plea despite numerous prior felony convictions. Petitioner was also instructed to address whether this issue had been exhausted or was procedurally barred.

---

[2]Petitioner's claims on appeal were: (1) the district court judge failed to conduct a de novo review; (2) his appellate counsel was ineffective in failing to raise claims based on trial counsel's ineffectiveness; (3) the police and the prosecution suppressed evidence that Lloyd and Brown received lenient treatment in exchange for their assistance in the investigation and prosecution of petitioner, and his trial counsel was ineffective in failing to adequately investigate and cross-examine Lloyd and Brown; (4) his trial counsel was ineffective in failing to investigate and put forth an alibi defense; (5) he is factually innocent; (6) his convictions violated the Double Jeopardy Clause; (7) he was denied a fair cross section of the community in the jury selection process; (8) he was incompetent to stand trial; (9) there was insufficient evidence to support his burglary conviction; (10) he was denied a fair trial by the introduction of other-crimes evidence; and (11) his trial counsel failed to conduct adequate legal research.

For the reasons stated below, we exercise jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a) and AFFIRM the district court's denial of habeas relief. [3]

## II.    DISCUSSION

### A.    Procedural Bar

Generally, the Oklahoma courts will not review in collateral proceedings an issue that could have been raised on direct appeal but was not. Okla. Stat. Ann. tit. 22 § 1086. Applying this rule in the state post-conviction proceedings, the OCCA determined that Petitioner's ineffective assistance of trial counsel claims had been procedurally defaulted because they were not raised on direct appeal. Because it found his ineffective assistance of appellate counsel claims to be without merit, the OCCA also found there was no cause and prejudice to excuse the procedural bar. The district court agreed and concluded that Petitioner's failure to raise his ineffective assistance of trial counsel claims did result in a procedural bar to that claim and that ineffective assistance of appellate counsel did not create cause and prejudice to excuse the failure.

_____

[3]Habeas petitioners are typically required to exhaust state remedies before filing federal habeas petitions. 28 U.S.C. § 2254(b)(1)(A). Respondent, however, has conceded that he waived his claim that Petitioner failed to exhaust all state remedies. Although this Court may raise exhaustion sua sponte, it is an "unusual step" and we find there is no particular reason to do so in this case. Gonzales v. McKune, 279 F.3d 922, 926 (10th Cir. 2002) (en banc).

- 16 -

We review the district court's finding of a procedural bar de novo. Ballinger v. Kerby, 3 F.3d 1371, 1374 (10th Cir. 1993). On habeas review, we will find a procedural bar on "issues that have been defaulted in state court on an independent and adequate state procedural ground, unless cause and prejudice or a fundamental miscarriage of justice is shown." Steele v. Young, 11 F.3d 1518, 1521 (10th Cir. 1993) (emphasis added). We find that Petitioner has failed to establish that Oklahoma's bar was not independent or adequate and that Petitioner has failed to demonstrate cause and prejudice to excuse the procedural bar. Therefore, Petitioner's claim is procedurally barred. [4]

### 1.    Independent and Adequate State Procedural Grounds

A procedural bar will be recognized in federal habeas proceedings only if there is an independent and adequate state ground for it. In English v. Cody, 146 F.3d 1257 (10th Cir. 1998), this Court held that a procedural bar requiring the ineffective assistance claim to be raised on direct appeal can be adequate only if 1) the Petitioner had different trial and appellate counsel and 2) the ineffectiveness claim could have been resolved "upon the trial record alone" or after adequately developing a factual record through some other procedural mechanism. Id. at 1263-64. In this case, Petitioner did have different trial and

---

[4]Petitioner does not allege a fundamental miscarriage of justice.

appellate counsel, but we agree with Petitioner that the issue of ineffective assistance of trial counsel could not have been resolved upon the trial record alone. [5]

Because Petitioner's claim required supplementation of the record on appeal, the next question to answer is "whether the applicable Oklahoma remand procedure was adequate to serve that purpose."       English , 146 F.3d at 1264-65. Rule 3.11 of Oklahoma's Court of Criminal Appeals provides a mechanism through which a defendant may supplement the record on direct appeal if he presents "clear and convincing evidence [of] a strong possibility trial counsel was ineffective."  Okla. Stat. Ann, tit. 22, ch. 18, Rule 3.11(B)(3)(b)(i).  In his § 2254 proceedings, Petitioner has not alleged that Rule 3.11 was inadequate to allow him to supplement the record on his ineffective assistance of trial counsel claim.

In Hooks v. Ward , 184 F.3d 1206 (10th Cir. 1999),     we explained that where "the record below is largely silent on the adequacy of Oklahoma's Rule 3.11 [providing for remand on direct appeal], the resolution of this issue on appeal will

---

[5]Even assuming that the preliminary hearing transcript and April 12-13, 1995, interview notes were in the record on direct appeal, the October 1995 "Guilty Plea: Summary of Facts" was not.  This document supported an important part of Petitioner's theory regarding Brown.  It supported the inference that at the time Brown initially spoke to the police regarding Petitioner, he believed he was getting some kind of deal with respect to his grand larceny charge, and this information could have been used to impeach Brown.  Thus, we conclude that Petitioner's claim "could only be adequately developed through supplementation of the record on appeal or additional fact-finding."       English , 146 F.3d at 1264.

depend on which party has the burden of proof to establish the adequacy or inadequacy of the state procedures." Id. at 1216. We concluded that the burden to establish the affirmative defense of procedural bar rests on the Respondent, id. at 1217; however, it is the Petitioner's burden to put the adequacy of the state remand procedure at issue in the first place:

> Once the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden to place that defense in issue shifts to the petitioner. This must be done, at a minimum, by specific allegations by the petitioner as to the inadequacy of the state procedure.

Id. Because Petitioner has not put the adequacy of Oklahoma's remand procedure at issue, he cannot demonstrate that Oklahoma's procedural bar is inadequate. Therefore, his claim is procedurally barred. [6]

### 2. Cause and Prejudice

Even where a procedural bar is found, however, an appellate counsel's ineffectiveness in failing to raise ineffective trial counsel on direct appeal can

---

[6] In Hooks, we remanded to the district court for a factual inquiry into the adequacy of Oklahoma's remand procedure. That decision, however, was based on the fact that the petitioner had filed his petition two years before English was decided, and thus could not have anticipated the need to discuss Oklahoma's remand procedures. Hooks, 184 F.3d at 1217. In this case, there is no such justification for Petitioner's failure to address the adequacy of the remand procedure because his habeas petition was filed in November 2000, after both English and Hooks were decided. See Spears v. Mullin, 343 F.3d 1215, 1252 n.31 (10th Cir. 2003).

constitute "cause" sufficient to excuse the bar, if the assistance provided by appellate counsel falls to the level of a constitutional violation. Murray v. Carrier, 477 U.S. 478, 488-89 (1986). [7] Reviewing this issue de novo, [8] we conclude that the assistance of Petitioner's appellate counsel was not constitutionally ineffective. Therefore, Petitioner has not established cause and prejudice to excuse the procedural bar.

To succeed on an ineffective assistance claim, Petitioner must show both his counsel's constitutionally deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). To show constitutionally deficient performance, a petitioner must show that his attorney "committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness." Castro v. Ward, 138 F.3d 810, 829 (10th Cir. 1998) (internal quotations and citations omitted). Counsel's

---

[7]An ineffective assistance of appellate counsel claim must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural bar. Murray, 477 U.S. at 488-89. The district court found that Petitioner did present his ineffective assistance of appellate counsel claim to the Oklahoma courts, and Respondent does not challenge that conclusion.

[8]Although Petitioner presented his ineffective assistance of appellate counsel claim to the Oklahoma courts, the OCCA never made a merits ruling on this specific issue. Thus, "we review the district court's legal conclusions de novo and its factual findings, if any, for clear error." Smallwood v. Gibson, 191 F.3d 1257, 1264 (10th Cir. 1999).

performance must have been completely unreasonable, not merely wrong. Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997).

To show prejudice, Strickland requires that a petitioner demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The performance and prejudice prongs of Strickland may be addressed in any order and need not both be addressed if the petitioner fails to make a showing of one. See Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999).

In reviewing counsel's decision to omit an issue on appeal, a court's "scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue. 'If the omitted issue is without merit, counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel.'" Hooks, 184 F.3d at 1221 (citing United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995)). The merits of Petitioner's ineffective assistance of trial counsel claims must, therefore, be examined to determine whether his appellate counsel's representation was deficient.

Because we find that Petitioner's claim of ineffective assistance of trial counsel is without merit, his ineffective assistance of appellate counsel claim cannot establish sufficient cause and prejudice to overcome the procedural bar.

### B.    Ineffective Assistance of Trial Counsel

The state district court and the OCCA did not reach the merits of Petitioners' ineffective assistance of trial counsel claim, finding instead that it had been procedurally defaulted. Because this claim was not heard on the merits by the state courts, we review the federal district court's conclusions of law de novo and its findings of fact for clear error.    Smallwood, 191 F.3d at 1264.

As described above, Petitioner must show both his trial counsel's constitutionally deficient performance and prejudice to succeed on this claim. Strickland, 466 U.S. at 687. Because we find that trial counsel's failure to cross-examine Brown on his grand larceny charge and one-year sentence for that crime neither constituted constitutionally deficient performance nor caused prejudice, Petitioner's ineffective assistance of trial counsel claim must fail.

As described above, to show constitutionally deficient performance, a petitioner must show that his attorney "committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness." Castro, 138 F.3d at 829 (internal

quotations and citations omitted). Counsel's performance must have been completely unreasonable, not merely wrong. <u>Hoxsie</u>, 108 F.3d at 1246. Petitioner argues that the only testimony that linked him to the crime was the testimony of two questionable witnesses. Therefore, he concludes, it must have been constitutionally deficient performance for trial counsel to fail to cross-examine one of those witnesses on a grand larceny charge pending against him at the time that witness implicated Petitioner to the police, when that witness subsequently received only a one-year sentence on those charges, despite nine prior felony convictions.

"Although counsel's <u>failure to impeach</u> a key prosecution witness is potentially the kind of representation that falls 'outside the wide range of professionally competent assistance,'" <u>Moore v. Marr</u>, 254 F.3d 1235, 1241 (10th Cir. 2001) (emphasis added) (quoting <u>Strickland</u>, 466 U.S. at 690), this case simply does not demonstrate a <u>failure</u> to impeach. Trial counsel impeached Brown on the inconsistencies between his trial testimony and his preliminary hearing testimony regarding what Petitioner was wearing when he approached Brown about the rings. She also elicited testimony from Brown regarding his reasons for helping the police. At the preliminary hearing, Brown testified he got the rings back because he was afraid if he did not, the police would implicate him in the crime. At trial, however, he claimed he felt pressure not from the police,

but from himself. Finally, trial counsel impeached Brown with information that Brown was violating the terms of his house arrest at the time he met with Petitioner about the rings. On direct examination, Brown had admitted that he was serving a fifteen-year sentence on a drug crime at the time he implicated Petitioner and had nine prior felony convictions.

Second, counsel could have feared that impeaching Brown regarding the alleged plea deal could have posed some logical inconsistencies, and counsel could have made a strategic decision not to impeach Brown on those grounds. In October 1995, Brown filled out a form indicating that he did not get the deal the Enid police had promised him on his sentence for the grand larceny charge. If he had not received the deal, why did he testify against Petitioner at the preliminary hearing a year later and again at the trial six months after that? Certainly, Petitioner may have been able to imply that, at the time Brown implicated Petitioner—April 1995—he thought he was getting a deal from the police, which he subsequently did not get, but this still does not explain why he would have testified at the preliminary hearing and trial. Furthermore, impeaching Brown on these grounds would have required that the jurors not only believe that Brown was lying, but that they also disbelieve the police detectives. This is because the April 12, 1995 notes reflect that the police clearly asked Brown whether he was getting any kind of deal and that Brown responded that he was not. It is possible

- 24 -

that counsel did not want to provoke the prosecution into calling the police detectives to rebut the implication that Brown had gotten a deal.

In sum, trial counsel impeached Brown on numerous grounds. Her failure to do so on one matter—a matter which might have been difficult to convince the jury of—does not qualify as constitutionally ineffective assistance. See Gillette v. Tansy , 17 F.3d 308, 311 (10th Cir. 1994) (finding that counsel was not ineffective for failing to impeach a witness with records of sales that would prove he was lying, when he instead impeached the witness "with questions concerning the animosity between the [witness] and petitioner").

Further, trial counsel gave the jury many reasons to disbelieve Brown's testimony, which they rejected. Giving them one additional reason to disbelieve Brown, when that reason had more than one possible explanation, does not create a "reasonable probability" that the outcome of this case would have been different. Cf. Strickland , 466 U.S. at 694.

Because Petitioner cannot prove either deficient performance or prejudice, he cannot establish the ineffective assistance of his trial counsel. Therefore, his ineffective assistance of appellate counsel claim must also fail and there is no cause to excuse the procedural bar.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief on the issue on which we granted COA.[9]  We DENY COA on all other issues.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

---

[9]Petitioner's motion for permission to file an appendix is GRANTED.