**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 2 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JOHN JACOB MARTINEZ,

    Petitioner - Appellant,

v.

ARISTEDES W. ZAVARAS,
Executive Director, Colorado
Department of Corrections; KEN
SALAZAR, Attorney General for the
State of Colorado,

    Respondents - Appellees.

No. 02-1131

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 96-N-1453)**

---

Howard A. Pincus (Michael G. Katz, Federal Public Defender, with him on the briefs), Assistant Federal Public Defender, Denver, Colorado for the Petitioner-Appellant.

Roger Griffin Billotte (Ken Salazar, Colorado Attorney General, with him on the brief), Assistant Attorney General, Denver, Colorado for the Respondents-Appellees.

---

Before **BRISCOE**, **ANDERSON** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

_____

Convicted of first-degree murder in state court, John Jacob Martinez brought a 28 U.S.C. § 2254 habeas petition in federal district court arguing that his Sixth Amendment right to conflict-free representation was violated. In denying habeas relief, the district court found that Martinez had voluntarily, intelligently, and knowingly waived his right to conflict-free representation. We exercise jurisdiction of the appeal under 28 U.S.C. §§ 1291 and 2253, and affirm.

**I**

On April 17, 1987, Martinez and his wife hosted a party at their home. At approximately 1:30 a.m., their neighbor Charles Walker, who lived in the adjoining duplex with his girlfriend Leigh Hinds, complained to Martinez, accusing one of the party-goers of urinating on his garage. An altercation ensued. Martinez ran into his house and returned outside brandishing a knife in the air. Walker fled down the street and Martinez gave chase. Subsequently, Hinds ran after them and found Walker, bleeding and alone. He had sustained at least eight stab wounds, including cuts to his face, scalp, scrotum, and back.

At approximately 3:00 a.m., some of the party-goers, including Charlie Blea, drove Martinez—whose clothes were blood-stained—along with Martinez's wife and children, to spend the night at the home of Susan Olguin, Martinez's aunt. Upon arriving, Martinez told Olguin's husband, Gregory Harris, that he had

stabbed someone in a fight. Walker died the next day due to loss of blood from the multiple stab wounds, and on May 15, 1987, Martinez was charged with first degree murder, one count of a crime of violence, and being an habitual criminal.

The court appointed defense counsel to represent Martinez. During a pre-trial discovery hearing held on January 25, 1988, the prosecution advised the court of a possible conflict of interest arising from defense counsel's representation in an unrelated case of Charlie Blea, whom the government identified as a potential witness at Martinez's trial. Defense counsel explained at the hearing the nature of his former representation of Blea, and Martinez agreed to waive any conflict that might arise from such representation.

At trial, four of the government's witnesses, including Olguin and Harris, failed to appear. Consequently, the trial court granted a continuance and scheduled a new trial to commence on February 22, 1988. Two weeks prior to commencement of the rescheduled trial, the prosecution informed the court and defense counsel that Olguin and Harris had been located and arrested for their failure to appear at the initial trial. Olguin and Harris told investigators that their failure to appear was on defense counsel's advice. At a hearing, the prosecutor informed the court of its intention to file a grievance against defense counsel, and expressed concern regarding the conflict that could arise were Martinez's attorney

to remain on the case. The judge ordered counsel to discuss the conflict with Martinez and to return the next day for another hearing on the issue.

At the following hearing, defense counsel had retained his own attorney, Elvin Gentry, who had advised him that the incident would indeed create a conflict. Accordingly, defense counsel requested to withdraw from the case. After discussing the matter with Martinez, the judge proposed to resolve the conflict by prohibiting both parties from interrogating Harris and Olguin as to the reason for their failure to appear at trial, and appointed independent counsel Frank Simons to advise Martinez on the conflict.

The court reconvened on February 12, 1988, at which time the matter was discussed further, including the possibility of Martinez waiving the potential conflict. At this point, a letter was submitted by Martinez, stating that he had decided to keep his attorney and proceed to trial on the scheduled date. Rather than accepting this waiver, the court opted to wait until Martinez had an opportunity to consult with independent counsel.

On February 17, 1988, the court convened to consider the potential conflict yet again. Independent counsel Frank Simons informed the court that he had met with Martinez and advised him regarding the potential for conflict arising from the threatened grievance. After extensive discussion in which the prosecutor, defense counsel, and the court each explained the nature of the conflict to

Martinez, Martinez announced his decision to waive his right to conflict-free representation, and the court denied defense counsel's motion to withdraw from the case. The trial commenced five days later as scheduled. Following a week-long trial, the jury convicted Martinez of first-degree murder.[1]

On direct appeal, the Colorado Court of Appeals vacated Martinez's conviction, concluding that defense counsel labored under an actual conflict of interest, and remanded the case to determine whether Martinez's waiver was voluntary, knowing, and intelligent. The Colorado Supreme Court reversed, concluding that the record sufficiently supported the trial court's finding that Martinez's waiver was not constitutionally impermissible. In May 1996, Martinez filed a petition for habeas corpus under 28 U.S.C. § 2254 in federal district court, claiming, inter alia, that his waiver of his right to conflict-free representation was not knowing, voluntary, and intelligent. The district court denied habeas relief, but granted a certificate of appealability on the issue of defense counsel's effectiveness as a result of the conflict.

## II

Because Martinez filed his habeas petition after April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA")

---

[1] The jury also convicted Martinez of being an habitual criminal, but this conviction was vacated by the Colorado Court of Appeals.

govern this appeal. See Lindh v. Murphy, 521 U.S. 320, 326–27 (1997). Given the state court review of the merits of Martinez's claims, habeas relief is not warranted unless the state adjudication "(1) . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). We presume that factual determinations made by the state court are correct, and the petitioner bears the burden of rebutting this presumption with clear and convincing evidence. § 2254(e)(1); Fields v. Gibson, 277 F.3d 1203, 1221 (10th Cir. 2002). This presumption does not extend to legal determinations or to mixed questions of law and fact. Herrera v. Lemaster, 225 F.3d 1176, 1178–79 (10th Cir. 2000). That is, the "deferential standard of review does not apply if the state court employed the wrong legal standard in deciding the merits of the federal issue." Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003).

Sitting en banc, the Colorado Supreme Court reviewed the merits of Martinez's claim that his waiver of conflict-free representation was not voluntary, knowing, and intelligent. In doing so, it enunciated the correct legal standards under Supreme Court precedent. First, it acknowledged that the Sixth Amendment right to effective assistance of counsel contemplates the right to

conflict-free representation under Holloway v. Arkansas, 435 U.S. 475, 483–84 (1978).  Next, it noted that this right may be waived, if it is done voluntarily, knowingly, and intelligently.  See Estelle v. Smith, 451 U.S. 454, 471 n.16 (1981).  Finally, it recognized that the trial court bears the duty to ensure that the defendant understands the nature of the conflicts and their effects on counsel's representation before waiving them.  Wheat v. United States, 486 U.S. 153, 161 (1988).  Upon announcing these standards, the court conducted a thorough review of the record, and held, with two justices dissenting, that Martinez's waiver was voluntary, knowing, and intelligent.

Defense counsel was subject to two potential conflicts in this case, arising from:  (1) his representation of Charlie Blea, a potential witness and suspect; and (2) the prosecution's statement of intent to file a grievance against him for allegedly advising Harris and Olguin not to appear at trial.[2]  We review the five hearings held to consider these conflicts to determine whether the state court acted unreasonably in concluding that Martinez appropriately waived them.

**A**

---

[2]  We do not further consider the propriety of the prosecutor's announcing before the court its intent to file a grievance, as opposed to simply informing the court of the conflict and its ethical implications, as this issue is not presented before us.

In concluding that any conflict arising from defense counsel's representation of Charlie Blea had been properly waived, the Colorado Supreme Court focused on two hearings held in January and February 1988, in which the trial court, prosecutor, and defense counsel each provided a clear explanation of the conflict to Martinez. Defense counsel explained that he had represented Charlie Blea in an unrelated criminal matter, and that Blea was identified as a potential witness in Martinez's case. The court asked Martinez whether he understood that his attorney represented "one of the witnesses against [him]" in the "very recent past," and whether he waived "any type of conflict that may [] arise[] from that representation" and wished to keep defense counsel on the case. (3 R. at 30.) Martinez answered these questions in the affirmative.

Despite these exchanges, Martinez maintains on collateral attack that his waiver was invalid because he did not know that the representation was potentially ongoing. This assertion is based on the fact that defense counsel had represented Blea in a drunk-driving case in which Blea had already been sentenced, but on which the time for moving for a sentence reduction had not yet expired. It is clear from the record that Martinez knew that defense counsel had represented Blea in the "very recent past," and any potential representation on the tangential sentencing matter is not material to a degree adequate to invalidate the

waiver. Thus, we reject the claim that the state court acted unreasonably in concluding that Martinez's waiver was valid.

**B**

Martinez's further assertion that the Colorado state court acted unreasonably in concluding that his waiver as to the grievance threatened against defense counsel was knowing and intelligent, and therefore effective, is predicated on the claimed failure of the trial court to properly advise him. This claim requires considerable cheek given that the trial court convened on four separate occasions to advise the defendant and to allow the court to assure itself that Martinez clearly understood the situation.

During the course of the evidentiary hearings held in February 1988, the prosecutor, trial judge, defense counsel, and independent counsel each explained the nature of this conflict to Martinez. On February 8, 1988, the prosecutor informed the court for the first time of the grievance he intended to file against defense counsel. In the presence of Martinez, the trial court thoroughly explained the implications of the potential grievance for Martinez's case. Identifying the problems that would arise were defense counsel to cross-examine Olguin and Harris for their failure to appear, the trial court highlighted the potential grievance's impact on defense counsel's ability to undermine Olguin's and Harris's credibility. Immediately following this explanation, Martinez informed

the trial court that he understood the circumstances, but that he nevertheless wanted to keep defense counsel as his attorney. Skeptical that Martinez adequately understood the situation, the court called a recess to permit defense counsel to discuss the issue further with Martinez.

When the court reconvened on the following day, the prosecutor again explained, in the presence of Martinez, how the grievance would impact defense counsel's willingness and ability to cross-examine Olguin and Harris. Martinez responded that he would defer to his attorney's decision on whether to withdraw, but stated that were he to withdraw, Martinez intended to proceed pro se rather than postpone the trial, expressing his desire to proceed to trial as quickly as possible.

After another recess during which defense counsel further explained the situation to Martinez, the prosecutor again stated the nature of the conflict for the benefit of the record:

> MR. MAY: . . . I'm not sure that the conflict has adequately at least in the record been explained to Mr. Martinez.
>
> ***
>
> What I see are a few things here that haven't been brought up. Obviously initially you have a grievance on the same—involving the same parties and on the same case as the defendant. [Defense counsel] has endorsed at least Susan Olguin as a witness that he may call at our first trial. I don't believe he endorsed Greg Harris. . . . I see this potentially as being number one, whether it puts him in a situation of should I call this witness or not. . . . How do I examine her directly or not? And what questions do I leave out? And it could put him potentially in a position of saying in his mind or having to go

over in his mind, Is this going to hurt me to ask her these questions or is this going to hurt my client. Once he starts getting into that situation, I see it being a conflict of interest.

Second, they have pointed out—and I'll put on the record—for instance, Susan Olguin has changed her stories from time to time. And I think this is what Mr. Brown was alluding to that it would be nice to cross examine her to say, You didn't show up because you didn't want to have to lie on the record; and in fact when you were in my office you said this and this and this and this.

What you're doing by your ruling is effectively telling [defense counsel] he can't go into that, those matters that she said in his office. One of the things she mentions is that I think she said she was potentially lying to the police in his office when they were having all these other discussions. Yet you're precluding some of those discussions coming out. So I think that's got to be brought out that it may affect who he calls how he direct examines them if he calls those people [sic]. Second, it could affect how he cross examines those people, particularly Greg Harris and Susan Olguin in terms of what they did and how they did it.

(2 Dist. Ct. R. at 389–90.) Defense counsel then informed the court that he had explained to Martinez the conflict, the advantages and disadvantages of keeping him as his attorney, and the advantages and disadvantages of proceeding with a new attorney, and that he had advised Martinez not to waive any conflicts.

At the next hearing, held on February 12, the court read aloud a letter submitted by Martinez, stating: "Evaluating the subject that was discussed in your chambers at the beginning of this week, I wish to make the decision of keeping my attorney and going to trial on the scheduled date." (2 id. at 398.) Rather than accepting the waiver at this time, the court directed Martinez to

- 11 -

consult with independent counsel to discuss the nature of the conflicts before waiving them.  During this same hearing, defense counsel explained the implications of the grievance as they related to the possibility of a plea agreement, again in the presence of Martinez.  He stated that his continued representation would be unfair to Martinez because the prosecutor was reluctant to offer a plea bargain for fear that any plea bargain would later be invalidated in light of defense counsel's conflicts.

The court then recessed for five days, during which time independent counsel Frank Simons consulted with Martinez to discuss the conflict arising from the threatened grievance.  On February 17, 1988, the court reconvened and Simons indicated that he had explained the conflict to Martinez, and that Martinez was "well-informed" and had a "good idea of what he wants to do."  (2 id. at 411.)  Martinez then announced his decision to retain defense counsel and proceed to trial on the scheduled date.  The court then engaged in the following colloquy with Martinez:

> THE COURT:  Okay.  Do you understand that a different attorney, if appointed to you, may be able to get a better plea bargain for you under the circumstances now?
> THE DEFENDANT:  Yes.  I don't want no plea bargain.
> THE COURT:  Do you understand that another attorney might be more effective in assisting you at trial than [defense counsel]?
> THE DEFENDANT:  I don't see how.
> THE COURT:  Well, there's certain questions that another attorney may be able to ask that [defense counsel] can't ask, okay?  Like why Miss Olguin and Mr. Harris didn't show up for trial.

THE DEFENDANT:  Yeah.

*** 

THE COURT:  And I am prepared to appoint a different attorney to represent you today if you want one.  Do you understand that?

THE DEFENDANT:  Yeah.  I don't want no other attorney.

THE COURT:  Okay.  Do you understand you'd be giving up the right—Insofar as there is a conflict, you'd be giving up your right to assert that conflict or to use that conflict in any way now or in the future.

THE DEFENDANT:  I don't really see no conflict here.  I see a prosecution by the D.A. which he has been doing from the start.

THE COURT:  Okay.  Well, whether it's true or false is really not important for purposes of this hearing.  There are certain things that [defense counsel] may well not be able to do that another attorney could do for you.  Do you understand that?

THE DEFENDANT:  Well, [defense counsel has] been on my case for the past ten months.  I am satisfied with him.  I wish to go to trial on the scheduled date.  I don't see no conflict.  And that's where I stand.

(2 id. at 412–14.)  Then, Simons confirmed that in his view, Martinez fully understood the situation, but was satisfied with defense counsel's representation to date, and "for that reason alone," wanted him to continue as his attorney.  (2 id. at 416–17.)  At this point, the court read aloud defense counsel's motion to withdraw and the grounds therein.  After listening to this, Martinez formally waived all conflicts.

In the face of the foregoing colloquies, Martinez's persistence in arguing that, despite these extensive hearings, his waiver was invalid, is puzzling.  Martinez argues that his waiver was not knowing and intelligent because he was not aware of the seriousness of the grievance threatened against defense counsel.

- 13 -

Yet, while Martinez may not have been aware of the consequences to defense counsel of a potential grievance, there is ample evidence in the record to show that he knew the consequences of the grievance to his case. He knew that defense counsel had an interest in not incriminating himself, by not eliciting testimony from Harris or Olguin that might implicate him in their reason for failing to appear at trial.

Martinez also argues that his waiver was invalid because he did not understand that the court's proposed resolution to the conflict—to prevent either side from asking Harris or Olguin about the reason for their failure to appear at the first scheduled trial—would not apply were another attorney to represent him. The record belies this claim. The trial court clearly told the defendant that were he to obtain another attorney, substitute counsel would be able to explore the matter. We are also unpersuaded that had such facts actually been presented to a jury, they would have been helpful to defendant's case.

Finally, Martinez cites to portions of the hearings where he states that he did not "see" any conflict. This suggests, he argues, that he did not understand the conflict. Given the extensive explanation of the conflicts by the judge, prosecutor, and defense counsel, in conjunction with Martinez's repeated assertions that he did in fact understand the situation, these statements must be interpreted to mean that, while Martinez understood the conflicts, he did not see

- 14 -

them as likely to compromise defense counsel's representation. We conclude that the Colorado Supreme Court did not act unreasonably in holding that Martinez's waiver as to this conflict was valid.

Crediting the heroic efforts of the trial court and the AEDPA deference owed to the decision of the Supreme Court of Colorado, which was properly conducted under federal constitutional standards, and considering our own review of the record, we conclude that Martinez is not entitled to the relief he seeks. The opinion of the district court is **AFFIRMED**.