**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DAVID TRAMMELL,

        Plaintiff-Appellant,

    v.

DAVID R. McKUNE, Warden, and
PHILL KLINE, Kansas Attorney
General,

        Defendants-Appellees.

No. 06-3316

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 05-CV-3354-JWL)**

Jean K. Gilles Phillips, Lawrence, Kansas, for Plaintiff-Appellant.

Jared S. Maag, Deputy Attorney General, for Defendants-Appellees.

Before **HARTZ**, **SEYMOUR**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

    David Trammell was accused of stealing a service station tow truck and

using it to steal another vehicle. His defense was that another man—Scott

Cross—committed the crime and framed him. The prosecution knew of Mr.

Trammell's defense, but failed to disclose physical evidence linking Mr. Cross to the tow truck theft. We hold that this failure constituted a violation of Mr. Trammell's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and therefore GRANT Mr. Trammell's petition for habeas corpus relief.

## I. FACTS AND PROCEDURAL POSTURE

### A. A Robber Steals a Tow Truck and Uses It to Steal a Corvette

The criminal charges in this case stem from two related incidents. The first occurred in June 1999, when a tow truck was stolen from an Amoco service station in Overland Park, Kansas. John Loper, then an Amoco employee, saw someone drive the truck from the station and pursued it. When the thief noticed Loper, he attempted to back the tow truck into Loper's car; Loper evaded that attempted strike, so the thief made a U-turn and rammed Loper's car head-on before driving away on the passenger's side of Loper's car. Loper testified that he saw the thief's face twice: once for "maybe" fifteen seconds while the thief was attempting to back into Loper's car, Trial Tr. vol. I, 57, and again for "approximately" twenty seconds while trying to avoid the head-on collision. *Id.* at 58–59.

The second incident occurred soon after the first. On July 5, 1999, the tow truck thief used his new acquisition to attempt to steal a 1986 Corvette from an apartment building in Merriam, Kansas. The Corvette's owner, John Kase, heard chains rattling outside his window and saw the would-be thief hooking his car to

the tow truck. Kase confronted the robber, who claimed that he was repossessing the Corvette. When Kase protested and said the Corvette was paid for, the robber said, "Buddy, I've got a gun. Go back to your apartment." *Id.* at 110. Kase refused to comply and inspected his car to see how securely it was attached to the truck—until, that is, the thief "grabbed a gun" from the front seat. *Id.* at 110–11. At that point, Kase "made a beeline back" to his apartment, *id.* at 111, and the robber drove off with the Corvette in tow.

By happenstance, Kase was not alone that day. His friend Scott Beckman was visiting from Minnesota. Mr. Beckman witnessed the confrontation but stayed close to Kase's apartment and therefore did not get as near to the thief as Mr. Kase did. During the episode, which he estimated took "anywhere from five to eight minutes," *id.* at 240, Mr. Beckman reentered Mr. Kase's apartment to search for documents that proved Mr. Kase owned the Corvette free from any liens. Shortly after he reemerged, Mr. Beckman saw the robber point the gun at Mr. Kase and drive away.

Messrs. Kase and Beckman jumped into Beckman's car and began following the tow truck. Just as they did, another of Mr. Kase's friends, John Eglich, arrived at Kase's apartment on a Kawasaki bullet bike. Mr. Eglich knew something was amiss because he saw the tow truck dragging the Corvette, its rear wheels "skidding" because it was still in park. *Id.* at 150–51. At Kase's urging, Eglich stayed on his motorcycle and chased the truck. *Id.* at 151. He pursued it

around the apartment complex for about a half a block until it stopped, whereupon Eglich pulled up next to the driver's side window and, while still seated on his motorcycle, asked the driver what he was doing. The driver answered, "I'm repoing this vehicle." *Id.* at 156. Eglich told the driver that the car was his friend's, that it was paid for, and that he was "not repoing anything." *Id.* The driver responded by pointing a gun at Mr. Eglich and saying, "Get away from the truck." *Id.* Before Mr. Eglich could react, the robber drove away. Mr. Eglich testified that this conversation lasted thirty to forty-five seconds. *Id.* at 169.

Before the truck left Eglich's view, the Corvette broke loose and was heavily damaged. Eglich renewed his pursuit, but the thief eluded him. Eglich returned to Mr. Kase's apartment where, minutes later, the robber reappeared and drove the tow truck toward Eglich as if to run him over. Eglich jumped off his motorcycle just in time to avoid a collision, and the robber left for good.

### B. In a Separate Investigation, Police Find the Tow Truck

On July 10, 1999—five days after the attempted Corvette theft—police officers in an unrelated investigation arrested Scott Cross for narcotics activity, theft, forgery, and using computers to facilitate the presentment of fraudulent checks. Cross was arrested in an Overland Park, Kansas, Econo Lodge motel room where he had set up his check forging operation. Police also found the stolen Amoco tow truck in the Econo Lodge parking lot. And they found a

cardboard box in Cross's motel room containing paperwork belonging to the Amoco station where the tow truck was stolen.[1]

During the interrogation following his arrest, Cross accused David Trammell of stealing the tow truck. Armed with this accusation but no physical evidence linking Trammell to the crimes, police prepared two separate photo arrays—both of which included Trammell's picture but not Cross's, despite the men's physical resemblance—and showed them to Loper, Kase, and Eglich. All three eyewitnesses identified Mr. Trammell as the tow truck driver.

## C. The State Prosecutes Trammell for the Crimes

Those three eyewitness identifications led the state to charge Mr. Trammell with three counts of aggravated assault, one count of felony theft, and one count of aggravated robbery. At trial, the three eyewitnesses recounted their photo array identifications and identified Mr. Trammell as the perpetrator in the jury's presence.[2]

---

[1]Officers also found in Cross's motel room a blue nylon bag that belonged to Trammell, and appellant's brief lists that bag as potentially exculpatory *Brady* evidence. Appellant's Br. 4. During oral argument, however, Trammell's counsel said that while "the nylon bag is important" because "it sort of feeds into some of the rest of the defense, . . . what's really crucial [are] the tow truck receipts." Oral Argument 2:36ff. We agree and thus focus our inquiry on the receipts.

[2]In its brief, the government refers primarily to these three eyewitnesses. A fourth, Rick Krigger, testified that he "briefly" saw the driver of the tow truck and identified the defendant as being "similar in appearance" to the driver. Trial Tr. 187-88. He was never shown a photo lineup and never saw Cross, either in

(continued...)

Mr. Trammell's defense proceeded on two fronts. First, his attorney argued that Cross had framed Mr. Trammell for the robberies because he was jealous that Trammell had been dating his ex-girlfriend, Janelle. The two men knew each other through her; Janelle lived with Mr. Cross while she was seeing Mr. Trammell. Second, Mr. Trammell's attorney argued that police officers were negligent in their investigation because—despite Cross's presence at the Econo Lodge when the tow truck was found and the physical resemblance between Cross and Trammell—officers did not include a photo of Cross in the arrays they showed to Loper, Kase, and Eglich.

Both theories gained traction when Scott Beckman, Mr. Kase's friend from Minnesota, testified at trial that police officers did not show him a photo array after the attempted Corvette robbery. Instead, the first array he saw was one that defense counsel prepared by substituting Cross's picture for Trammell's in one of the police-prepared arrays. Beckman picked Cross as the robber, testifying he was "70 percent" certain of his pick. *Id*. at 249

The jury ultimately convicted Mr. Trammell, but not before posing these questions to the judge during its deliberations: "1. At what point in the deliberation, do we decide that we are a hung jury? 2. What is the outcome of a

[2](...continued)
person or in a photo.

hung jury? 3. If we can decide on some counts and not on others, is that an acceptable decision?" App. to Jury Instr., 40, July 25, 2001.

Nearly six weeks after Trammell was convicted, the government realized it failed to disclose that police found the Amoco receipts in Cross's motel room. It revealed its error to Trammell's lawyers, and this late-breaking disclosure led to a motion for a new trial based on newly discovered evidence. The trial court denied Mr. Trammell's motion and sentenced him to 102 months imprisonment. The Kansas Court of Appeals affirmed his conviction, *State v. Trammell*, No. 88,722, 2003 WL 22175781 (Kan. Ct. App. Sept. 19, 2003), and the Kansas Supreme Court granted review and also affirmed, *State v. Trammell*, 92 P.3d 1101 (Kan. 2004). It held that Mr. Trammell was not entitled to a new trial because "the evidence is not material in the sense that it would have created a reasonable doubt and affected the outcome of the trial." *Id.* at 1115.

### D.    Federal Habeas Proceedings

Mr. Trammell timely filed a habeas corpus petition under 28 U.S.C. § 2254 in the United States District Court for the District of Kansas after the Kansas Supreme Court denied relief. He alleged that the government violated his *Brady* rights by withholding the Amoco tow truck receipts evidence. He also argued that the Kansas Supreme Court applied the incorrect legal standard when evaluating his *Brady* claim.

The district court agreed with Mr. Trammell's second argument and held that the Kansas Supreme Court misapplied the *Brady* standard. But it also held that, despite the Kansas Supreme Court's error, Trammell was not entitled to a new trial because the Amoco receipts were not material under *Brady*. After denying Mr. Trammell's petition, the district court granted his request for a certificate of appealability "on the issue whether the petitioner was denied due process by the failure to deliver exculpatory evidence to the defense in a timely manner." R. Vol. I., Doc. 32, at 1–2. Our jurisdiction thus arises under 28 U.S.C. §§ 1291 and 2253.

## II. DISCUSSION

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) "place[d] a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Under AEDPA, a state prisoner seeking federal habeas relief must show that the state court decision of which he complains "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This standard requires federal courts to show deference to "a state court's legal conclusions," *Allen v. Mullin*, 368 F.3d 1220, 1233 (10th Cir. 2004), but it does not create a

presumption that such determinations are correct. *Martinez v. Zavaras*, 330 F.3d 1259, 1262 (10th Cir. 2003). AEDPA, however, does create a presumption that a state court's factual determinations are correct, 28 U.S.C. § 2254(e)(1), which a petitioner may rebut by clear and convincing evidence, *Zavaras*, 330 F.3d at 1262.

AEDPA's deferential standard does not apply "if the state court employed the wrong legal standard in deciding the merits of the federal issue." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). When that has occurred, federal courts "resolve the claim unconstrained by AEDPA deference," *Revilla v. Gibson*, 283 F.3d 1203, 1220 n.14 (10th Cir. 2002)—that is, we review *de novo* the state court's legal conclusions and resolution of mixed questions, *Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001). The *de novo* standard also applies to our review of a federal district court's legal conclusions in a § 2254 action, though we review any factual findings it may have made for clear error. *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006).

In this case, Mr. Trammell argues—and the government concedes—that we should review the Kansas Supreme Court's decision *de novo* because it "applied a standard inconsistent with that which is set forth under United States Supreme Court precedent." Appellee's Br. 19. We proceed accordingly.

**B.      The Amoco Receipts in Cross's Hotel Room Are Material Under *Brady*.**

In the usual case, a defendant seeking habeas relief for an alleged *Brady* violation "must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Snow v. Sirmons*, 474 F.3d 693, 711 (10th Cir. 2007) (internal quotation marks omitted). This case, however, turns on *Brady*'s third element—materiality—because the State has conceded the first two elements. Appellee's Br. 15.

The standard for determining *Brady* materiality is well established. The "touchstone of materiality is a 'reasonable probability' of a different result," which exists "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). This inquiry does not permit piecemeal evaluation of suppressed evidence; instead, courts must

> "review the cumulative impact of the withheld evidence; its utility to the defense as well as its potentially damaging impact on the prosecution's case. Furthermore, . . . [courts should] evaluate the materiality of withheld evidence in light of the entire record in order to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist. What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict."

*Snow*, 474 F.3d at 711 (quoting *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995)).

The district court held that the Amoco receipts were not material because they "do[] not cast any doubt on the eyewitness identifications, and the evidence discovered in Cross's motel room is consistent with [Mr. Trammell's] testimony that Cross stole items from him." Op. 16.[3] We think this is too narrow a conception of the role that the suppressed evidence would have played. Defense counsel would not have used it solely to impeach the eyewitnesses or buttress his claim that Cross broke into Trammell's house. The receipts directly link Cross to the stolen truck, and defense counsel could have used the evidence to support his theory of the case—that Cross is the one who stole the tow truck, which is how the box of tow truck receipts got into his motel room. This evidence could also have been used to cast doubt on police officers' decision to focus their attention (including the photo arrays) on Trammell rather than Cross.

The potential importance of this evidence is underscored by closing arguments. Almost at the beginning of his rebuttal argument, the prosecutor told the jury: "There is virtually no evidence to suggest or to corroborate what Mr. Trammell wants you to believe, that Scott Cross set him up." Trial Tr. vol. I, 327. But if the government had disclosed the Amoco receipts, as required under

---

[3]During trial, Trammell testified that someone stole TVs, a VCR, tools, and clothes from him on July 4, 1999; based on anecdotal evidence from his neighbors, he thought Janelle was the thief. Trial Tr. vol. I, 281–82. The inference that those stolen goods were somehow connected to the box containing Amoco receipts, an item of comparably less value and therefore less likely to be stolen, is puzzling—particularly when none of the items Trammell mentioned were found in Cross's motel room.

-11-

*Brady*, the jury would have known that the physical evidence in the case connected Cross with the crime: the tow truck was found in the parking lot of Cross's motel and receipts from the tow truck were found in a box in Cross's motel room. Only after being confronted with that evidence did Cross finger Trammell. The prosecutor's rebuttal statement appeared accurate only because the government failed to disclose the Amoco receipts. In a trial with all the exculpatory physical evidence in play the government would not be able to pursue the line of argument that there was "virtually no evidence" corroborating the theory of the defense.

In finding that the evidence against Mr. Trammell was so strong that the withheld evidence was not material, the district court relied heavily on the fact that three eyewitnesses at trial identified Trammell as the perpetrator. Op. 12–14 (citing *Trammell*, 92 P.3d at 1106, 1109). But this evidence may be less powerful than it at first appears. There was evidence that Trammell and Cross were "similar in appearance." Trial Tr. vol. I, 64. Yet neither in the photo arrays nor in court were the prosecution witnesses enabled to compare the two men. The photo arrays shown to the prosecution witnesses contained Trammell's picture, but not Cross's. And by the time the trial started, two of the eyewitnesses already had read newspaper articles naming Mr. Trammell as the suspect. Tr. Hr'g Mot. to Suppress Identification, 14–16. The articles may have stated, falsely, that Trammell's fingerprints were found on the tow truck. *Id.* at 16; Trial Tr. vol. I,

95, 174. At a preliminary hearing, the prosecution witnesses already knew that Mr. Trammell was the defendant, and they saw him in an orange jumpsuit; they then identified him as the perpetrator. Tr. Hr'g Mot. to Suppress Identification, 5, 39. The witnesses never saw Mr. Cross, or even his picture. Trial Tr. vol. I, 63, 140–41. Cross did not testify at the preliminary hearing or at trial. In light of these suggestive circumstances, the reliability of their in-court identification is less than ironclad. Moreover, the only eyewitness who was given a photo array with Mr. Cross's picture identified him as the perpetrator. *Id.* at 246–47. Based on these facts, we do not think that the eyewitness identifications carry as much weight as the district court assigned to them.

This is a close case. The eyewitness identifications, though occurring under seemingly questionable circumstances, were nonetheless consistent despite thorough cross-examination. We are not certain that timely disclosure of the Amoco receipts would have resulted in a different result. But that is not the standard. We need to be convinced only that "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (internal quotation marks omitted). Of this we are persuaded. Exercising *de novo* review, we hold that the Amoco receipts were material under *Brady* and that the government violated Mr. Trammell's due process rights by failing to disclose this evidence before trial.

## CONCLUSION

We **GRANT** Mr. Trammell's habeas corpus petition, **VACATE** his convictions, and **REMAND** for a new trial.