**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 19, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RANDALL TRAVIS GREEN,

     Petitioner-Appellant,

v.

MIKE ADDISON,

     Respondent-Appellee.

No. 12-5004

(D.C. No. 4:09-CV-00480-TCK-TLW)
(N. D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **McKAY** and **HOLMES**, Circuit Judges.

Petitioner Randall Travis Green, currently a state prisoner in Oklahoma, appeals

from the district court's denial of his petition for writ of habeas corpus filed pursuant to

28 U.S.C. § 2254. His appeal follows our grant of a certificate of appealability (COA) on

a single issue. We vacate only that portion of the district court's decision dismissing

Green's § 2254 petition which alleged his convictions rested upon perjured testimony

knowingly offered by the government. We remand to the district court to hold an

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.
    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of this
appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered
submitted without oral argument.

evidentiary hearing.

## I. Background

In 2006, Green was convicted by a jury in Rogers County, Oklahoma, on ten

felony offenses: three counts of first-degree rape, two counts of forcible sodomy, one

count each of first-degree burglary, extortion, and kidnapping, and two counts of the

lesser-included offense of second-degree rape. He was sentenced to a total of seventy-

three years in prison with the sentences to run consecutively.

Green was charged with sexually assaulting four victims: 26-year-old Korie

Bethel, 13-year-old L.S., 13-year-old J.C., and B.O., who turned 15 years old between the

first and second incidents of assault.[1] Green was 23 years old at the time of the second

offense against B.O., and 22 years old at the time of the other incidents.

Green argues that L.S. and J.C.'s testimony at trial was false and coerced by the

prosecution. L.S. and J.C. each testified that on October 1, 2005, they were babysitting at

Christina Crawford's house for Crawford's two children. At around 11:00 p.m., Green

arrived at the house with a friend, Jeffrey Peppers, and asked for Crawford. After

learning that Crawford was not home, Green asked to speak with L.S., who was his

former neighbor. According to L.S. and J.C.'s testimonies, Green took L.S. into a

bedroom while J.C. and Peppers were outside of the house. In the bedroom, Green pulled

---

[1] Per 10th Cir. R. 25.5, the minors involved in this case are identified by their initials.

2

down L.S.'s pants and raped her. Afterward, L.S., J.C., Green, and Peppers talked in the living room. A few minutes later, Green asked J.C. to go into the garage with him. Green asked J.C. to perform oral sex on him and asked her to have sex with him. J.C. refused. Green then forced J.C. to perform oral sex on him, and forced her to have sexual intercourse with him. The two then returned to the living room. Ten minutes later, Green and Peppers left the house.

At trial, Bethel testified that in the early morning of August 30, 2005, she and Green were talking with mutual friends outside of her apartment. Bethel returned to her apartment after the group had dispersed. As Bethel was opening the door to her apartment, Green forced himself inside and raped and sodomized her for several hours. Bethel claims that after the attack, Green forced her to sign a note stating the encounter was consensual.

B.O. testified that Green forced her to have sex with him several times between November 2005 and January 2006. This occurred at Green's sister's house. B.O. claimed that the sex was non-consensual but admitted that she had returned to that house several times, leading to more sexual encounters with Green.

The jury convicted Green of all charges related to J.C., L.S., and Bethel. The jury convicted Green of second-degree rape of B.O., acquitting him on the first-degree rape charge.

Green directly appealed his judgment and sentence to the Oklahoma Court of Criminal Appeals (OCCA), raising three points of error: the prosecution's failure to

3

corroborate the victims' statements, prejudice from joinder of multiple claims, and ineffective assistance of trial counsel. The OCCA affirmed the state district court's judgment and sentence.

Green then filed a pro se application for post-conviction relief in the state district court, arguing that he was deprived of due process in violation of his Fourteenth Amendment rights and that he received ineffective assistance of trial and appellate counsel in violation of his Sixth Amendment rights. In his post-conviction motion, Green alleged that he was denied due process by the prosecution's knowing use at trial of false and coerced testimony from J.C. and L.S. In support of his motion, Green submitted the transcript of a conversation between J.C., J.C.'s mother, and David Starkey, who was conducting an independent investigation of official misconduct in Rogers County. The conversation took place on January 27, 2008. It was recorded by Starkey and later transcribed by a court reporter. The transcript includes a signed and notarized verification page, where J.C. and her mother signed a statement indicating that they had reviewed all the contents of the transcript and confirmed the contents to be "true and correct." They also initialed each page of the transcript. In his post-conviction application, Green also requested an evidentiary hearing "so that a record can be made to reflect what actually transpired." ROA, Vol. 1 at 117.

During the interview with Starkey, J.C. revealed that Green did not rape her. According to J.C., "On my statement, it said specifically I was not raped, I -- I did that willingly, and then . . . the next thing I know, I'm reading a paper that says, you know,

4

this is . . . first-degree rape." Id. at 138-39. J.C. explained that she was coerced into falsely accusing Green of rape. In her interview, J.C. said that Wayne Stinnett, an investigator for the Rogers County District Attorney's Office, and Patrick Abitbol, an assistant district attorney, told her, "'You have to say in the camera that he raped you; otherwise, it's not going to work and then you can get thrown in juvie, and which you will." Id. at 140.

J.C. also stated in the interview that she believed L.S. had not been raped by Green, whom she refers to as Travis:

> [J.C.]: That was all [L.S.], and it's just because Travis would not go out with her. That's the thing, Travis won't go out with her. They just wanted to be little buddies -- he wanted to be little buddies, and that's -- that's all there is to it. She lied. I'm -- I'm highly doubting she even had sex with him. I mean, yeah, she was, like, all over him and stuff.
> . . .
>
> [J.C.]: If -- no -- yeah, if our stories weren't the same, then I was going to go to juvie. I don't know what they said to [L.S.] because, you know, we were -- we're not allowed to speak of anything what they tell us, and that's what they told us.
> So me and [L.S.], we're sitting there and we're like, "What'd they say to you?"
> "I can't tell you. I'll go to juvie," you know.
>
> DAVID STARKEY: So she was threatened with juvie too.
>
> [J.C.]: I guess so.
>
> . . .
>
> She was like, "I just don't want to go to juvie," and, you know, that -- that kind of makes me wonder, Well, did they

5

threaten you too? Because she told me that straight up at court. She's like, "I don't want to go to juvie."

Id. at 141-45.

The state district court denied Green's application for post-conviction relief without holding an evidentiary hearing. Despite evidence of J.C.'s interview transcript, the state court found that "the facts relayed by J.C. are consistent throughout and are not the creation of the State." Id. at 292. The state district court reasoned that "J.C. has not testified in this proceeding that her testimony at trial was false," and that "[t]he statements made by J.C. outside the confines of these proceedings do not in and of themselves suggest that J.C.'s statements at trial were false." Id. The state district court also "[did] not find the out of court statements probably true, nor that said statements would result in an acquittal." Id. The OCCA affirmed the state district court's denial of Green's application for post-conviction relief, noting that "[t]he transcript of the conversation between victim J.C., her mother and David Starkey is simply that, a conversation." Id. at 339. The OCCA described the transcript as "convoluted" and "disjointed." The OCCA also said that "[i]t contains no recantation of the victim's original claims, nor does it constitute proof of Petitioner's innocence." Id.

Green attempted to obtain post-conviction relief from the state district court a second time on separate grounds. The state district court denied his second petition for post-conviction relief, and the OCCA affirmed the denial on appeal.

On July 22, 2009, Green filed a petition for habeas corpus under 28 U.S.C. § 2254

6

in federal district court. He identified seven grounds for relief: (1) the allegations were not corroborated as required by law; (2) the three separate groups of offenses should have been tried separately so as to avoid prejudice; (3) Green was denied effective assistance of trial counsel when counsel failed to object to joinder; (4) Green's convictions rest upon perjured testimony that the government knowingly offered; (5) an expert witness improperly vouched for the truthfulness and credibility of the alleged victims; (6) the state failed to disclose exculpatory impeachment evidence regarding a victim's prior rape allegation; and (7) Green was denied effective assistance of appellate counsel when counsel failed to assert certain claims of error on direct appeal. Green also requested an evidentiary hearing in his federal petition for habeas corpus. The federal district court dismissed Green's petition in full and denied COA in the same order.

Green appealed and applied for COA in this court. Green's request for a COA focused on a single proposition: whether Green's convictions rest upon perjured testimony that the government knowingly offered. A COA was granted on that issue, counsel was appointed for Green, and briefing was received from both parties.

## II. Discussion

### A.      Standard of Review

"Our review of a petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")." Fairchild v. Workman, 579 F.3d 1134, 1139 (10th Cir. 2009). To the extent that the petitioner's claims were adjudicated on the merits in state court, we may grant habeas relief only if

7

the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[F]actual findings of the state court are presumed correct unless the applicant rebuts that presumption by 'clear and convincing evidence.'" Hooks v. Workman, 689 F.3d 1148, 1163 (10th Cir. 2012) (quoting 28 U.S.C. § 2254(e)(1)). "The deferential AEDPA standards of review do not apply 'if the state court employed the wrong legal standard in deciding the merits of the federal issue.'" Douglas v. Workman, 560 F.3d 1156, 1170 (10th Cir. 2009) (quoting Cargle v. Mullin, 317 F.3d 1202 (10th Cir. 2003)). Because we concluded in our order granting Green COA that the state court applied the wrong legal standard to Green's petition[2], we consider the state court's legal conclusions and resolutions of mixed questions de novo. Trammell v. McKune, 485 F.3d 546, 550 (10th Cir. 2007). "We review the district court's legal analysis of the state court decision de novo." Hooks, 689 F.3d at 1163 (citations and quotations omitted).

B.    Request for Evidentiary Hearing

Green argues that he is entitled to an evidentiary hearing on his due process claim. He acknowledges that based on the record, the court "cannot conclusively determine that

_____

[2] Green alleged violation of his due process rights by the state's knowing presentation of perjured testimony. The OCCA instead stated Green claimed "that new evidence has been discovered which proves he is innocent of the charged offenses." ROA, Vol. 1 at 338.

8

the prosecution knowingly presented false testimony at his trial," but that an evidentiary hearing would allow him to develop the evidence. Aplt. Reply Br. at 20.

### 1. Diligence in Pursuing the Factual Basis

28 U.S.C. § 2254(e)(2) states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claims unless the applicant shows that –
> > (A) the claim relies on
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Green does not contend that he can satisfy the requirements of § 2254(e)(2). Instead, Green argues that he "has diligently attempted to develop the factual basis for his allegations, and the state courts have prevented him from doing so." Aplt. Reply Br. at 21. The Supreme Court has held that under § 2254(e)(2), "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). "If the prisoner did not fail to develop the factual basis of his claim in State

9

court, § 2254(e)(2) is not applicable and a federal habeas court should proceed to analyze whether an evidentiary hearing is appropriate or required under pre-AEDPA standards." Cannon v. Mullin, 383 F.3d 1152, 1176 (10th Cir. 2004) (citations and quotations omitted). Here, the threshold issue is whether Green has exercised sufficient diligence in state court to avoid the requirements of § 2254(e)(2). See Barkell v. Crouse, 468 F.3d 684, 693-94 (10th Cir. 2006).

"Diligence for purposes of [§ 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Williams, 529 U.S. at 435. According to the Supreme Court, diligence requires that the prisoner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." Id. at 437 (emphasis added). Green sought evidentiary hearings with the state district court in the manner prescribed by Oklahoma law and has satisfied Williams's baseline requirement for diligence. See ROA, Vol. 1 at 117 ("Mr. Green respectfully moves this Honorable Court to schedule an evidentiary hearing in this matter so that a record can be made to reflect what actually transpired."); 22 Okla. Stat. §§ 1084 ("If the [post-conviction] application cannot be disposed of on the pleadings and record, or there exists a material issue of fact, the court shall conduct an evidentiary hearing at which time a record shall be made and preserved."). However, we have held that requesting an evidentiary hearing in state court does not ipso facto satisfy the § 2254(e)(2) diligence requirement. Cannon, 383 F.3d at 1176-77. "The federal district court should not be required to conduct an evidentiary

10

hearing on a claim when the applicant for relief has not presented evidence that would be readily available if the claims were true." Id. at 1177.

Here, Green has presented to the state court the complete transcript of J.C.'s interview stating that her testimony at trial against Green was false and coerced. The transcript, which was signed and notarized, is equivalent to an affidavit under Oklahoma law. See 12 Okla. Stat. § 426; 28 U.S.C. § 1746. See also Cannon, 383 F.3d at 1176-77 (citing Dowthitt v. Johnson, 230 F.3d 733, 758 (5th Cir. 2000) (holding that "sometimes diligence requires obtaining pertinent affidavits")). We cannot see what more Green could have done to pursue development of the record. Accordingly, Green has satisfied the diligence requirement, and AEDPA does not preclude Green from receiving an evidentiary hearing.

### 2. Allegations, If True and Not Contravened, Would Entitle Green to Habeas Relief

Because Green is not barred from receiving an evidentiary hearing under AEDPA, his request for an evidentiary hearing is considered under the pre-AEDPA standard, "which provides that the habeas applicant is entitled to an evidentiary hearing in federal district court 'if (1) the facts were not adequately developed in the state court, so long as that failure was not attributable to the petitioner, . . . and (2) his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief.'" Barkell, 468 F.3d at 696 (quoting Cannon, 383 F.3d at 1175). As already discussed, the failure of a state-court evidentiary hearing cannot be attributed to Green. We will focus on the

11

second prong of the pre-AEDPA test and consider whether Green is entitled to an evidentiary hearing in federal court if his allegations, if true and not contravened by the record, would entitle him to habeas relief. See id.

The government contends that Green's allegations are contravened by the factual record. The government cites J.C.'s testimony against Green at trial, her victim impact statement read at Green's sentencing hearing, as well as sworn affidavits from Assistant District Attorney Abitbol, Investigator Stinnett, Assistant District Attorney Jenny Sanbrano, Victim Witness Coordinator Debbie James, and John Crockett, a practicing attorney, regarding the truth and reliability of J.C.'s testimony. However, if J.C. was in fact coerced into providing false testimony against Green at trial, J.C.'s testimony at trial and the affidavits provided by the government do not necessarily contravene J.C.'s later allegations; J.C.'s testimony at trial and the affidavits provided by the government could also be consistent with J.C.'s later allegations that the district attorneys wanted J.C. to testify a certain way so that they could "put a lot of years on [Green]." ROA, Vol. 1 at 166, 169.

The OCCA, in its decision affirming the state district court's decision to deny Green habeas relief, concluded that J.C.'s later interview "contains no recantation of [J.C.'s] original claims, nor does it constitute proof of Petitioner's innocence." ROA, Vol. 1 at 339. The government concedes that our review of the state court's application of law is de novo, but argues that under 28 U.S.C. § 2254(e)(1), the OCCA's factual findings are entitled to a presumption of correctness, where the petitioner has "the burden

12

of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1). We conclude that Green has rebutted this presumption by clear and

convincing evidence. In her interview with Starkey, J.C. specifically recanted her

original allegations against Green and explained how her testimony was coerced by the

district attorney:

> [JC]: [Abitbol] said specifically, "You have to say in the camera that he raped you; otherwise, it's not going to work and then you can get thrown in juvie, and which you will."
> So, of course, you know, I'm thinking, all right. I'm going on camera, so I'm -- I'm saying -- I'm like, "Well, you know, he took me in the garage and he raped me." What else was I supposed to do? Not just think I'm going to juvie?
>
> DAVID STARKEY: So he threatened you with juvenile hall if you didn't --
>
> [JC]: Yeah.
>
> DAVID STARKEY: -- say you were raped.
>
> [JC]: Yeah.
>
> . . .
>
> [JC]: And he said . . . if I didn't say it correctly, . . . like he told me to and it went to court . . . the very next day I would be -- there would be no buts, I would have to go to juvie because they wouldn't believe it.
>
> [J.C.'s mother]: They -- they'd say you were lying.
>
> [JC]: They would be say I -- I would be lying.

Id. at 140-41. The conversation then turned to J.C.'s statement that Green, whom J.C.

refers to as Travis, used a knife:

13

DAVID STARKEY: What about the knife?

[J.C.]: The -- there was no knife, all right? That was -- that was [L.S.]

Before Stinnett came to my house, she went -- he went to theirs, so I guess she told him that there was a knife involved. There wasn't at all. There was no -- he did not pick up a knife or anything and we did not pick up a knife to get him out of the house. There was none of that.

DAVID STARKEY: Is that was the -- the report said?

[J.C.]: Yeah, it said that.

DAVID STARKEY: What -- tell me what -- what Stinnett put in there.

[J.C.]: Stinnett put exactly what I said, that he picked up a knife and me and [L.S.] went and grabbed a knife and shooed him out, and that's not what happened at all.

[J.C.'s mother]: Then whose idea was it to bring up the knife?

[J.C.]: [L.S.]'s.

[J.C.'s mother]: Oh, that was [L.S.]?

[J.C.]: That was all [L.S.], and it's just because Travis would not go out with her. That's the thing, Travis won't go out with her. They just wanted to be little buddies -- he wanted to be little buddies, and that's -- that's all there is to it. She lied. I'm -- I'm highly doubting she even had sex with him. I mean, yeah, she was, like, all over him and stuff.

But the knife, the -- basically, in her report, I had to say it too because --

. . .

me and her were together . . . that night.

So her report came -- ended up to be my report and my report ended up to being her report, so we had to kind of put it together and make one big deal about it, which I was -- me and [L.S.] were lying to our families, to our friends, to the

14

court system --

   . . .

[Stinnett] threatened me with juvie, threatened me if I didn't say -- you know, [L.S.] and my report together, then it would be --

   . . .

DAVID STARKEY: But they threatened you with juvenile hall.

[J.C.]: Uh-huh.

[J.C.'s mother]: If you guys's stories wasn't the same?

[J.C.]: If -- no -- yeah, if our stories weren't the same, then I was going to go to juvie.

Id. at 141-45.

J.C.'s interview contained a recantation of her testimony at trial as well as a thorough explanation of how the prosecution threatened her with juvenile detention so that she would testify against Green. Further, under Oklahoma law, the signed and notarized interview transcript is equivalent to an affidavit, so the interview was more than simply just a "conversation."

Assuming that Green's allegations are true, Green would be entitled to habeas relief. In our order granting Green COA, we held that the OCCA misapprehended Green's legal argument and applied the wrong legal standard, contrary to clearly established federal law from the Supreme Court:

First, in Mooney v. Holohan, 294 U.S. 103, 112-13 (1935), the Court held that it is a violation of due process for the government to deliberately deceive judge and jury "by the

15

presentation of testimony known to be perjured." Then, in Napue v. Illinois, 360 U.S. 264, 269 (1959), the Court held that a defendant's due process rights are violated when the government knowingly offers false evidence that could have affected the outcome of the trial. Finally, in United States v. Agurs, 427 U.S. 97, 103-04 (1976), the Court explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." The Agurs Court explained that this is one specific application of the general rule from Brady v. Maryland, 373 U.S. 83 (1963), which "involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense." Agurs, 427 U.S. at 103.

Aplt. Reply Br. Attach. 1 at 8-10.

The relevant inquiry in whether Green would be entitled to habeas relief is whether (1) "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony"; (2) "the prosecution knew, or should have known, of the perjury"; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103. See also Giglio v. United States, 405 U.S. 150, 154 (1972) ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" (quoting Napue, 360 U.S. at 271)). Assuming that Green's allegations are true, the first two prongs of the Agurs test are satisfied. We also conclude that assuming Green's allegations are true, there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. J.C. in her interview denied that Green forced her to have sex with him. J.C. also expressed her doubt over whether L.S. had any sexual contact with Green. Based on the

16

interview transcript alone, it is ambiguous whether J.C. had consensual sex with Green, or whether J.C. and Green engaged in sexual activities at all. An evidentiary hearing would allow for full development of the facts. If J.C. had consensual sex with Green, under Oklahoma law, Green would still be guilty of first-degree rape for having sexual intercourse with a victim under the age of 14.[3] But even assuming that J.C. engaged in consensual sexual activities with Green, there is a reasonable likelihood that the jury relied on J.C.'s testimony that she was forcibly raped to sentence Green to ten years in prison for the rape of J.C., which is five years more than Oklahoma's five-year mandatory minimum sentence for first-degree rape. See 21 Okla. Stat. § 1115; ROA, Vol. 2 (sealed) at 155. There is also a reasonable probability that the jury was influenced by J.C. and L.S.'s testimony in its conviction and sentencing of Green for the rapes of Bethel and B.O.

If Green were able to establish a due process violation, the error would not be harmless. The harmless error standard holds that "habeas relief is proper only if the error

---

[3] According to Oklahoma state law:
> Rape in the first degree shall include:
>> 1. rape committed by a person over eighteen (18) years of age upon a person under fourteen (14) years of age; or
>> . . .
>> 5. rape accomplished with any person by means of force, violence, or threats of force or violence accompanied by apparent power of execution regardless of the age of the person committing the crime.

21 Okla. Stat. § 1114(A).

had a 'substantial and injurious effect or influence in determining the jury's verdict.'"

Bland v. Sirmons, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). "However, once Brady error is established . . ., 'there is no need for further harmless-error review.'" Douglas, 560 F.3d at 1173 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).

Accordingly, we VACATE only that portion of the district court's decision dismissing Green's § 2254 petition which alleged that his convictions rested upon perjured testimony knowingly offered by the government. We REMAND to the district court to hold an evidentiary hearing on that issue.

Entered for the Court


Mary Beck Briscoe
Chief Judge