FILED
United States Court of Appeals
Tenth Circuit

May 14, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOSEPH DAVIS,

          Petitioner-Appellant,

v.

SAM CLINE, Warden, Ellsworth
Correctional Facility; ATTORNEY
GENERAL OF KANSAS,

          Respondents-Appellees.

No. 07-3182
(D.C. No. 06-CV-3127-KHV)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

Joseph Davis was charged by the state of Kansas with two counts of

aggravated burglary. He was acquitted on the first count, convicted on the

second, and sentenced to 114 months in prison. After exhausting his state-court

remedies, Mr. Davis petitioned for federal habeas relief under 28 U.S.C. § 2254 in

the United States District Court for the District of Kansas, claiming, among other

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

things, that the prosecution withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The district court denied his application but granted him a certificate of appealability (COA) on the alleged *Brady* violation. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we defer to the state-court's decision, as we must, and affirm.

**I**

On the morning of April 9, 1998, Olga Lozina and her husband, Dmitri Novikov, were sleeping in their apartment. They had recently moved to the United States from Russia and spoke little English. Mrs. Lozina was awaken by an African-American male standing near her bed. She woke her husband, who recognized the intruder and told him that he had seen him before. The intruder fled, and after the incident, a set of Mr. Novikov's keys was missing.

Three days later, on April 12, 1998, Kristina Vogel was watching television in her apartment sometime around midnight. She heard someone come in, looked over her balcony, and from about ten feet away saw an African-American male in his early twenties. He asked twice, "Is Jeff here?" R., Vol. V at 58. When Ms. Vogel said no, the man apologized and left. Later, Ms. Vogel discovered that approximately five dollars had been taken from her wallet and a backpack belonging to her roommate's boyfriend, Henry Volante, was gone. Inside the backpack were several items, including two calculators inscribed with Mr. Volante's name and initials.

On April 24, 1998 – fifteen days after the first burglary and twelve days after the second – police invited Mr. Novikov and Ms. Vogel to view a photo-array of potential suspects. Mr. Davis's photo was included in the lineup, but neither victim could identify their intruder.[1] Nevertheless, police executed a search warrant on Mr. Davis's apartment, which was located some three blocks away from where the burglaries occurred. During the search, police recovered the two calculators bearing Mr. Volante's name and initials. Mr. Davis claimed that his former roommate, Jerry Hunter, "had a lot of stuff . . . he was trying to get rid of." *Id.*, Vol. VI at 41. He explained that Hunter had desk computers, calculators, and a tote sack, and asked Mr. Davis to sell the items for him. When Mr. Davis declined, Hunter simply gave him the calculators.

On April 29, 1998, police asked Mr. Novikov, Mrs. Lozina, and Ms. Vogel to view a second photo-array. A more recent photo of Mr. Davis was included in this lineup, and this time both Mr. Novikov and his wife identified him as their burglar. Ms. Vogel expressed reservations about choosing a potential suspect but indicated that Mr. Davis's photo "could possibly[,] most likely be him." *Id.*, Vol. V at 64. Police subsequently arrested and charged Mr. Davis with both crimes.

At the preliminary hearing, Mr. Novikov testified with the aid of an interpreter that he recognized the intruder as a man who had come to his

---

[1] The record indicates that Mrs. Lozina also viewed the first photo-array and also failed to identify Mr. Davis, but at trial, the police officer who administered the lineup denied formally showing it to her. *See* R., Vol. VI at 6 and 15-16.

apartment two weeks before the burglary offering to sell him a gold ring from his hand. Mr. Novikov declined to buy the ring, but he gave the man five dollars. During the hearing, when asked if the burglar was in the courtroom, Mr. Novikov replied, "I'm not sure." Prelim. Hr'g Tr. at 7. Under cross-examination, Mr. Novikov was confronted with the description of the suspect he gave to police after the burglary: "Black male, early twenties, shaved hair, 5'4", under 145 pounds, wearing dark clothing." *Id.* at 13. Mr. Novikov explained that he gave his description in meters, centimeters, and kilograms, and the police probably converted the measurements to inches and pounds. He said he never uses inches or pounds and could not remember telling police the intruder had a shaved head.

Mrs. Lozina testified at the preliminary hearing as well. Through an interpreter, she stated that she woke up at five a.m. on April 9, 1998, because a black man was next to her bed holding her clothing. The man tried to tell her husband something, but her husband was unable to understand because "he was still half asleep." *Id.* at 17. She stated that she too had seen the intruder before, approximately three weeks prior to the burglary, when he knocked on their door. When asked if the burglar was in the courtroom, Mrs. Lozina directed her attention to Mr. Davis and replied, "I am certain that this is the man." *Id.* at 18. Under cross-examination, Mrs. Lozina testified that she had described the burglar to police "in general terms" through her husband because she does not speak English. *Id.* at 20. She stated that police twice showed her photos of potential

suspects, and although she could not identify anyone in the first lineup, she identified the burglar in the second. She added, "I'm simply certain that the first time in the first picture lineup the picture of the man was not among the pictures that were shown." *Id.* at 22. When asked if she was positive that Mr. Davis's photo was not included in the first lineup, she said, "Yes, positive." *Id.* at 24.

Ms. Vogel was the last witness to testify at the preliminary hearing. She stated that she was expecting her roommate to come home on the night of the burglary, and when she heard someone enter the apartment, she looked over her balcony from the third floor to see what her roommate was doing. To her surprise, she saw a stranger look up and ask, "Is Jeff here? Is Jeff here?" *Id.* at 26. She replied, "no," adding, "There's no Jeff here." *Id.* at 26-27. The man said, "I'm sorry," and left. *Id.* at 27. Ms. Vogel went to lock the door and discovered that the man had rifled through her wallet, which she had left on the kitchen table. She said that it "was a matter of a second or minutes perhaps" between the time the man left her apartment and the time she found her wallet in the kitchen. *Id.* at 28. When asked if the man was in the courtroom, Ms. Vogel replied, "Well, so far as I can say, it's that man." *Id.* She stated that Mr. Davis matched the description of the person in her apartment and explained:

> Basically, it was a black male. I saw him only for a matter of seconds, but I remember from what he was wearing and stuff. He wasn't – it wasn't as though he was like a homeless man. I don't know. He looked kind of well groomed – maybe not well groomed – just from what I can recall, it was the stranger in my house.

-5-

*Id.* at 29. On cross-examination, Ms. Vogel estimated that she was twelve to thirteen feet from the burglar and stated that the apartment was very well-lit. She recalled that she described the burglar to police as a black male in his early twenties, possibly twenty to thirty years old. He wore a white tank-top with red lettering, but she could not remember the word on his shirt. She remembered that police first showed her a photo lineup three to five weeks after the burglary, but she could not identify a potential suspect. She recalled that when police showed her the second lineup, she thought one of the photos "resembled the burglar," but she was not positive. *Id.* at 36. Finally, she revealed that Mr. Volante was present when she viewed the second lineup, and after she selected Mr. Davis's photo, police informed them that Mr. Volante's calculators had been recovered from "someone's house." *Id.* at 41.

Mr. Davis proceeded to trial on the theory that his former roommate, Jerry Hunter, had committed the crimes. He submitted evidence that Hunter had allegedly burglarized an apartment just two days after the Vogel burglary, on April 14, 1998, and that stolen items were recovered from Hunter's apartment the following day, April 15, 1998. Mr. Davis tried to introduce evidence of Hunter's arrest several weeks later, on June 1, 1998, for burglarizing another residence in the same vicinity as the other three apartments, but the trial court excluded the evidence as too remote. Additionally, Mr. Davis submitted a photograph of Hunter to the jury and insisted that the state's identification witnesses had poor

recollections of the actual intruder. He argued that the description given to police by Mr. Novikov – 5'4", 145 pounds, early 20's – does not match Mr. Davis, who was in his early thirties, weighed over 180 pounds, and had a mole on the right side of his face. He argued that police used inappropriate or suggestive techniques to procure the pre-trial identifications, an allegation bolstered by Mr. Novikov's failure to make an in-court identification during the trial. The prosecution countered that Hunter was irrelevant and that both Mrs. Lozina and Ms. Vogel positively identified Mr. Davis during the trial. After hearing the evidence, the jury convicted Mr. Davis of the Vogel burglary, but acquitted him of the Novikov/Lozina burglary. The Kansas Court of Appeals affirmed, *State v. Davis*, 996 P.2d 854, No. 82,239 (Kan. App. Mar. 24, 2000) (unpublished), and the Kansas Supreme Court denied review.

Mr. Davis subsequently sought state post-conviction relief under Kan. Stat. Ann. § 60-1507. At the post-conviction hearing, Mr. Davis's trial attorney, John Frydman, testified that Mr. Davis originally told him that the property recovered from his apartment had been abandoned by a former tenant, but he subsequently changed his story to the version that it had been left behind by Hunter. Mr. Frydman stated that he pursued a defense based on the theory that Hunter was the true burglar and, to that end, reviewed a court file from the April 14, 1998, burglary in which Hunter was the named defendant. He also attended one of Hunter's court hearings to discern any similar physical characteristics between

Hunter and Mr. Davis but concluded that they did not look alike. Nevertheless, Mr. Frydman submitted a photo of Hunter to the jury that bore a greater resemblance to Mr. Davis than Hunter did in reality.

On cross-examination, Mr. Frydman was presented with police reports showing that Hunter had been investigated for committing several other burglaries in a similar manner as the Novikov/Lozina and Vogel burglaries. One report indicated that Hunter had gone into an apartment in 1995 and, when confronted by an occupant, asked if Jeff was there. There was also a prosecution affidavit dated October 16, 1995, indicating that both Hunter and Mr. Davis matched a description given of a black, male suspect. When Mr. Frydman denied receiving this information from the prosecution, Mr. Davis argued that the documents were exculpatory evidence that the prosecution should have disclosed. The state district court rejected his arguments, however, and denied relief. *Davis v. State*, No. 00c000000394 (Douglas County Dist. Ct. Sept. 24, 2003) (unpublished).

Mr. Davis appealed, claiming ineffective assistance of counsel, due process violations caused by the prosecution's failure to disclose evidence of Hunter's involvement in other burglaries, and an improper jury instruction, but the Kansas Court of Appeals affirmed the denial of relief. *Davis v. State*, 100 P.3d 975, 2004 WL 2694260, No. 91,517 (Kan. App. Nov. 24, 2004) (unpublished). Mr. Davis then resorted to federal habeas relief, again alleging ineffective assistance of counsel and a *Brady* violation stemming from the prosecution's

failure to turn over the purportedly exculpatory evidence, as well as cumulative error. The district court denied the petition but granted COA on the *Brady* claim. We now consider the merits of Mr. Davis's appeal.[2]

## II

The extent of our review is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under 28 U.S.C. § 2254(d), federal habeas review of state convictions is limited where state courts have adjudicated a claim on the merits. Mr. Davis's *Brady* claim was adjudicated on the merits by the state courts, and our review is therefore deferential: Mr. Davis can prevail only if he demonstrates that the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d). A state-court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts" Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state-court decision involves an "unreasonable application of clearly established Federal law" if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The state court's factual

_____

[2] Mr. Davis declined to seek COA in this court on his ineffective assistance of counsel and cumulative error claims. Our review is therefore limited solely to whether he was denied due process by the prosecution's alleged *Brady* violation.

determinations are presumed correct unless Mr. Davis provides clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). We do not, however, defer to the state court if it "employed the wrong legal standard in deciding the merits of the federal issue." *Martinez v. Zavaras*, 330 F.3d 1259, 1262 (10th Cir. 2003) (quotation omitted).

Mr. Davis claims the prosecution violated his *Brady* rights by withholding evidence of Hunter's involvement in four other burglaries. The specific evidence he cites includes police reports from: 1) an October 15, 1995, burglary, where the perpetrator asked, "Is Jeff here?," and Hunter was later selected from a photo lineup as resembling the intruder; 2) an October 16, 1995, burglary, where the perpetrator said, "I have the wrong number," and Hunter was later identified in a photo lineup; 3) a November 2, 1989, burglary, where the perpetrator said, "I thought this was Tom's house, I'm looking for Tom," Hunter was found wearing clothes taken from the burglary, he admitted that he may have entered the residence, was identified in a photo lineup, and pleaded guilty to committing the crime; and 4) a June 1, 1998, burglary, where Hunter was apprehended fleeing from a home and told police that he thought he knew the residents. Mr. Davis also cites a prosecution affidavit dated October 16, 1995, indicating that he and Hunter matched a description given to police. He argues that this evidence would have shown that he and Hunter bore a physical resemblance to one another and that Hunter used the same modis operandi as that used in the Vogel burglary.

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[T]o establish a *Brady* violation, a habeas petitioner must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) that the evidence was material." *Knighton v. Mullin*, 293 F.3d 1165, 1172 (10th Cir. 2002) (quotation omitted). Our inquiry focuses on the third prong of the *Brady* analysis – whether the evidence was material. "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Moore v. Marr*, 254 F.3d 1235, 1244 (10th Cir. 2001). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the case. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

On state post-conviction, the Kansas district court rejected Mr. Davis's *Brady* arguments, reasoning that he made no specific requests for the police reports implicating Hunter, the information was not patently exculpatory, and the reports did not undermine confidence in the verdict:

> Although the prosecutor had a duty to disclose the evidence she
> believed to be exculpatory and material, the undisclosed information
> was not readily apparent to be exculpatory or material in nature; that
> is, 1995 police reports involving Mr. Davis and Mr. Hunter as
> suspects in residential burglaries and more recent police reports that

mentioned Mr. Hunter as a burglary suspect. "As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation. Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a *Brady* violation." *Smith v. Sec'y of N. Mex. Dept. of [Corrs.]*, 50 F.3d 801, 827 (10th Cir. 1995). The undisclosed information does not add enough that it could reasonably be taken to undermine confidence in the verdict. Evidence that some other person was burglarizing the neighborhood during the same time period was introduced to the jury, and that could have supported a different verdict had the jury found it persuasive.

*Davis*, No. 00c000000394, slip op. at 5-6. The Kansas Court of Appeals adopted

this analysis, but not before holding that:

when the prosecutor has not deliberately and in bad faith withheld evidence from the defense and has not refused to honor a request for such evidence, a new trial should be granted only if: (1) the prosecutor withheld the evidence; (2) the withheld evidence was clearly exculpatory; and (3) the withheld exculpatory evidence was so material that to withhold this information from the jury was clearly prejudicial to the defendant.

*Davis*, 2004 WL 2694260, at *9. Mr. Davis argues that both courts articulated the

wrong standard of materiality. He suggests that the "sliding scale" employed by

the state district court is contrary to Supreme Court precedent because the

materiality of evidence is no longer evaluated according to the specificity of the

defendant's request. Aplt. Br. at 16. He contends that the Kansas Court of

Appeals' decision is wrong because the prosecution's good faith is irrelevant,

there is no requirement that evidence be "clearly exculpatory," and a defendant

need not show "clear prejudice." *Id.* at 16-17.

Initially, the state district court did not err in using a sliding scale to evaluate the materiality of the evidence. Notwithstanding the Supreme Court's adoption of a single standard in *Bagley*, the nature of the defendant's request for exculpatory evidence remains germane to the materiality analysis because, in deciding whether the evidence undermines confidence in the verdict, "the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 683. The rationale is that "the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist." *Id.* at 682-83. In fact, as the state district court recognized, we explained in *Smith v. Secretary of New Mexico Department of Corrections*, 50 F.3d 801, 827 (10th Cir. 1995), that "[u]nder this more flexible, sliding scale approach to assessing the materiality *vel non* of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation." Hence, the state district court correctly evaluated the materiality of the evidence given that Mr. Davis never requested it.

With regard to the Kansas Court of Appeals' decision, the Supreme Court does not require that evidence be "clearly exculpatory" or "so material" that to withhold it would clearly prejudice the defendant. But this error does not give us license to wholly disregard the state appellate court's decision. *See Gipson v.*

*Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state court's] decision unless we conclude that its result – not its rationale – is legally or factually unreasonable." (internal quotation marks omitted)). The linchpin in *Brady* cases is whether the evidence, had it been disclosed, would have undermined confidence in the verdict. *Bagley*, 473 U.S. at 682. Put differently, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Snow v. Sirmons*, 474 F.3d 693, 711 (10th Cir. 2007) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). And on this score, there can be no denying that the Kansas Court of Appeals employed the correct standard of materiality when it adopted the state district court's reasoning. Indeed, as the federal district court recognized, the Kansas Court of Appeals expressly agreed that the evidence did "not add enough that it could reasonably be taken to undermine confidence in the verdict." *Davis*, 2004 WL 2694260, at *9. Thus, having employed the proper standard of materiality, we cannot say the Kansas Court of Appeals' decision is contrary to clearly established federal law.

Nor may we conclude that it unreasonably applied that law to the facts of this case. Rather, for all the reasons discussed in the federal district court's cogent and well-reasoned order dated May 24, 2007, we find that the state-court's decision was not an unreasonable one, albeit perhaps one different than we might

-14-

have reached.  Consequently, we accord the state-court decision AEDPA deference and affirm the denial of Mr. Davis's habeas petition.

The judgment of the district court is AFFIRMED.  Mr. Davis's motion to proceed in forma pauperis is GRANTED.

Entered for the Court

Michael R. Murphy
Circuit Judge